George W. Connitt et al., Appellants, *v.* The Reformed Protestant Dutch Church of New Prospect et al., Respondents.

The decision of ecclesiastical judicatories as to their own jurisdiction in ecclesiastical matters, where there is not clearly an absence of jurisdiction, should receive great weight in civil courts.

Where such tribunals have jurisdiction, civil courts cannot inquire whether they have proceeded according to the laws and usages of their church, or whether they have decided correctly; but their decisions are final and binding upon the parties and courts.

Under the constitution of the Reformed Protestant Dutch Church in America, the relation between a pastor of a church of that denomination and his congregation may be dissolved by the classis, within whose bounds such church is.

This power is not limited to a case where a pastor has been tried for some offence affecting his religious or moral character, but is general and discretionary.

A contract made by a pastor of that faith by his acceptance of a call, in the form prescribed by such constitution, is not terminable at the mere option of either party and can only be terminated by mutual assent, or in some of the modes specified by said constitution and prescribed by the laws and usages of the church.

The authorities upon the question of the right of civil courts to review ecclesiastical decisions, collated and discussed.

*Smith* v. *Neslon* (18 Vt., 511) disapproved; *Austin* v. *Searing* (16 N. Y., 112) distinguished.

The refusal of an officer or trustee to perform the duties of his office while it may be ground of removal, does not, of itself, create a vacancy.

(Argued September 16, 1873; decided January term, 1874.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, rendered upon a case submitted under section 372 of the Code.

The questions submitted for decision are, substantially, whether George W. Connitt, one of the plaintiffs, is still the pastor of the Reformed Protestant Dutch Church of New Prospect; if not, when did he cease to be pastor? Is he entitled to any salary since May 3d, 1869; and, if so, up to what date? Which of the parties are now the consistory of the church? And from what time, if any, is Mr. Connitt liable to pay rent for the use and occupation of the parsonage?

The General Term adjudged: 1. That George W. Connitt ceased to be pastor, May 3, 1869, and is not entitled to any salary after that date; 2. That the two judgments taken by default in favor of Mr. Connitt against the church be discharged and vacated; 3. That the individual defendants (respondents in this appeal) are the true consistory of the church; 4. That the church is entitled to recover rent from Mr. Connitt, for the use of the parsonage, from February 7, 1871.

The facts, pertinent to the questions discussed, are sufficiently stated in the opinion.

*T. R. Westbrook* for the appellants. Mr. Connitt is entitled to his salary, because neither of the parties to the contract have sought to terminate it. (*Robertson* v. *Bullions*, 1 Kern.,

243, 263–265; *Bunell* v. *A. Ref. Church*, 44 Barb., 282, 308, 309.) A contract between a minister and his people cannot be added to by implication. (*Smith* v. *Nelson*, 18 Vt., 511.) The consistory of the church had no power to terminate Mr. Connitt's pastorate. (*Dutch Church* v. *Bradford*, 8 Cow., 457; *Martin* v. *Hinite*, Cowp., 437; *Religious Soc.* v. *Stone*, 7 J. R., 115; *Young* v. *Ransom*, 31 Barb., 49; *Sheldon* v. *Cong. Parish of Easton*, 24 Pick., 281; *Avery* v. *Tyringham*, 2 Mass., 160, 169, 170.) The act of the classis and the synods in attempting to annul the contract, being without jurisdiction, cannot control the action of the civil courts. (*Petty* v. *Torker*, 21 N. Y., 267, 271; *Austin* v. *Searin*, 16 id., 112, 123–125; *Delmar* v. *Ins. Co.*, 14 Wall., 661, 665, 666; *City of Richmond* v. *Smith*, id., 429, 438; *Witherspoon* v. *Duncan*, 4 id., 217; *Smith* v. *Nelson*, 18 Vt., 511–551; *Watson* v. *Avery*, 2 Bush, 332; *Chase* v. *Cheney*, Am. L. Reg., May, 1871, p. 295; *Sheldon* v. *Cong. Parish of Easton*, 24 Pick., 281; *Walker* v. *Wainright*, 16 Barb., 486, 487; Const. R. P. D. C., art. 1, chap. 2, §§ 1, 2, 6.) The act of the classis in suspending and then deposing Mr. Connitt is void. (*Dutch Church* v. *Bradford*, 8 Cow., 494; *Oakley* v. *Aspinwall*, 3 Comst., 549, 550.)

*M. Schoonmaker* for the respondents. Mr. Connitt's tenure of office as pastor was not for life or any specified time. (*Humbers* v. *St. Stephen's Ch.*, 1 Edw. Ch., 308; *Dutch Church* v. *Bradford*, 8 Cow., 466, 467; *Youngs* v. *Ransom*, 31 Barb., 49, 58.) The classis had power to dissolve the pastorate. (*Dutch Church* v. *Bradford*, 8 Cow., 457, 518.) Where ecclesiastical tribunals have jurisdiction, their decisions are final and binding upon the parties and the civil courts. (*Watson* v. *Jones*, Am. L. Reg., July, 1872, vol. 11 [N. S.], 430, 445–447; *Robertson* v. *Bullions*, 9 Barb., 64; *Bap. Ch.* v. *Witherell*, 3 Paige, 296; *Nutter* v. *Gable*, 2 Den., 492; *Ger. R. Ch.* v. *Seibert*, 3 Barr [Penn.], 282; 7 Hal. [N. J.], 206–215; *Chase* v. *Cheney*, Am. L. Reg., May, 1871;

*Jarvis* v. *Hathaway*, 3 J. R., 180; *Dutch Church* v. *Bradford*, 457, 504, 518, 527.)

Earl, C. The plaintiff Connitt was called to be the pastor of the Reformed Protestant Dutch Church of New Prospect, by a form of call prescribed by the constitution of the Reformed Protestant Dutch Church in America. He accepted the call and was duly installed as such pastor. This call and its acceptance constituted the contract between the parties. If we were to look exclusively at that and construe it as we would any ordinary civil contract, we would find it to be a contract for no specified duration of time, and probably terminable at the option of either party. But the call provided that he was "to fulfill the whole work of the gospel ministry, agreeably to the Word of God and the excellent rules and constitution of the Reformed Protestant Dutch Church established in the last national synod at Dordrecht, and ratified and explained by the ecclesiastical judicatory under which all stand, and to which you, in accepting this call, must with us remain subordinate." Thus, the constitution, rules and usages of the church were made a part of the contract and are to be used and referred to in construing it. I have carefully looked into and examined them, and, considering the nature of the contract and the objects to be attained thereby, am of the opinion that it was not terminable at the mere option of either party thereto, but that it was to remain in force until terminated by mutual consent or in some of the modes specified in the constitution and prescribed by the laws and usages of the church. It seems to have been so treated by the parties and by all the church judicatories before which the matter was brought. But I do not find it important definitely to determine this question; for, assuming the contract to be of the permanent nature claimed for it by Mr. Connitt, I still reach a conclusion adverse to him.

After Mr. Connitt had been pastor of the church about eighteen months, three of the four elders and three of the

four deacons of the church, together with certain members of the church, applied in writing to the classis to have the pastoral relation dissolved, for certain causes stated. The classis appointed a committee to visit New Prospect and confer with the parties, and to report, for final action, to a special meeting of the classis, to be held November 17th, 1868. The special meeting was held and the committee reported that Mr. Connitt had refused to appear before them, but that they had investigated the matter referred to them, and, for reasons stated by them, advised the adoption of a resolution recommending to both parties mutually to agree to separate, as for the interest alike of pastor and people. On two successive Sabbaths, December 28, 1868, and January 3, 1869, Mr. Connitt read to the congregation of the church a paper giving his views of his relation to the people under his ministerial charge, and his reasons for refusing to consent to the dissolution of his pastoral relation with them. On the twenty-fourth day of January, the three elders and three deacons caused to be read, to the congregation assembled for public worship, a paper signed by them, stating that, under the existing troubles in the church, they did from that time forth decline to act as elders and deacons " under the present pastor." At a meeting of the classis, April twentieth, Mr. Connitt presented a memorial stating the presentation of the above-mentioned paper to the congregation by the elders and deacons and their refusal thereafter to attend any meeting of the church consistory, stating also that " the said elders and deacons have not resigned, but refused to serve; by means of which the consistory is left without a quorum and unable to transact any business whatever, and the church of New Prospect is thereby in danger of complete and fatal disorganization," and praying " for such relief as comes within the constitutional prerogative of a classis to give, in order that the consistory of New Prospect may be so reconstructed as to perform its proper functions." He immediately requested that the paper be returned to him, and he then, on the next day, presented

charges against said elders and deacons, specifying various offences against them. On the same day the said elders and two of said deacons again presented to the classis a communication imploring a dissolution of the pastoral relation in their church. The classis then adjourned, to meet at New Prospect, May third, to consider the charges made by Mr. Connitt against the elders and deacons; and, it met on that day and appointed a committee to confer with Mr. Connitt and the consistory and others interested, to endeavor to settle the difficulty between them without a resort to judicial proceedings. The committee acted, and reported that, after a lengthened interview with the parties, they found no way practical for adjusting the difficulty, and therefore they referred the matter back to the wisdom of the classis. Thereupon it was resolved that the charges be laid upon the table, and that a committee be appointed to prepare a minute embracing the reasons of the classis for so doing, and a minute of the action proper to be taken by the classis upon the application of the elders and deacons for a dissolution of the pastoral relation. The committee was appointed, and subsequently reported, recommending the passage of the following resolutions, giving reasons therefor :

" *Resolved,* That the elders and deacons aforesaid be recommended to resume their official duties.

" *Resolved,* That the classis do, in virtue of their inherent power and duty in the care of the church, hereby dissolve the pastoral relation between the Rev. G. W. Connitt and the church of New Prospect."

And the resolutions were adopted. This was May third. Mr. Connitt at once gave notice of appeal from this action to the Particular Synod of Albany. There, after a hearing of the parties, the decision of the classis was affirmed. He then appealed to the General Synod, and there he was again heard and the decision was again affirmed.

After the decision of the classis, one party claimed that Mr. Connitt ceased to be the pastor of the church, and the other that his pastoral relation and his right to his salary continued,

and these conflicting claims present the principal question to be determined in this case.

I am of opinion that the classis had jurisdiction to make the decision, and that the pastoral relation was properly dissolved. Mr. Connitt was not called as an independent religious teacher to minister in holy things among the people who called him; he was called, as a minister ordained in the Reformed Protestant Dutch Church in America, to be the pastor of a church belonging to that religious organization. It was part of his contract that he should be subordinate to and under the jurisdiction of the judicatories of that church, and that he should discharge his pastoral duties in obedience to the constitution, laws and usages thereof.

Under the constitution of that church there are four ecclesiastical assemblies or judicatories: (1.) The consistory, composed of the minister, elders and deacons; (2.) the classis, composed of all the ministers, and an elder delegated from each consistory within certain bounds; (3.) the particular synod, composed of two ministers and two elders from every classis within certain bounds; (4.) The general synod, composed of three ministers and three elders from each classis within the bounds of the whole country. In these assemblies or judicatories it is provided that ecclesiastical matters only shall be transacted, and that a greater assembly shall take cognizance of those things alone which could not be determined in a less, or that appertain to the churches or congregations in general which compose such an assembly.

Before a student for the ministry can be licensed, he must be examined by the classis to which he belongs, and from which his license is to emanate. Every candidate for the ministry is under the immediate direction of the classis, and is to preach where it directs him. He is not permitted to refuse a call from any congregation without first consulting the classis for proper advice. He is to be admitted and ordained to the full ministry after examination by the classis. Before his ordination he is required to subscribe to a formula, promising, among other things, to teach the doctrines of the

church, and that, in case he has any difficulties about such doc-
trines, he will first reveal his difficulties to the consistory,
classis or synod, that the same may be there examined, and
that he will, on pain of suspension from his sacred office, sub-
mit to the judgment of the consistory, classis or synod, and that
either of those bodies can, upon sufficient grounds of suspicion,
require of him an explanation of his sentiments respecting the
doctrines and faith of the church.   No minister, relinquishing
the service of his own church, or being unattached to any
particular congregation, shall be permitted to preach indis-
criminately from place to place without the consent and
authority of the classis.   No minister can be called to or dis-
missed from a congregation to accept a call elsewhere without
the permission of the classis.   When a minister, from old
age or other infirmities of mind or body, becomes unable to
fulfill the duties of the ministry, the classis can declare him
*emeritus*, and excuse him from further services, and still
require his congregation to furnish him a support.   The con-
sistory is obliged to make certain reports of the condition of
the churches to the classis, and the classis is authorized to
make inquiries whether the ministers discharge their duty
in teaching the doctrines and faith of the church.   The classis
has power not only to ordain but also to suspend and depose
ministers, to form new congregations and determine the
boundaries thereof, to continue combinations of two or more
congregations, and to dissolve and change the same, and to
exercise a general supervising power in cases of appeal over
the acts and proceedings of the consistories within their
bounds, which relate to the spiritual concerns of their par-
ticular churches and the conduct of any of the officers
thereof.

We have thus briefly called attention to the constitution of
this church organization for the purpose of showing how
extensive are the power and jurisdiction of the classis in rela-
tion to all ecclesiastical matters affecting the churches, pas-
tors and congregations within its bounds.   It was clearly
intended to provide, by means of the four judicatories, a com-

plete system of ecclesiastical government and discipline for the churches and congregations and all their officers, in order that the doctrines of the church might be faithfully taught, order preserved, and the prosperity and the growth of the church promoted. The judicatories are upon an ascending grade, " a greater assembly taking cognizance of those things alone which could not be determined in a less, *or that appertain to the churches or congregations in general which compose such an assembly.*" The classis has complete and full ecclesiastical jurisdiction over the pastors and churches within its bounds. If it has not, where has such jurisdiction been lodged? It cannot be doubted that it was intended to be vested in some or all of the church judicatories. If it was not, then the form of church government provided was incomplete, and discords, which no judicatory has power to remedy, might creep into the church and produce wide-spread disaster. While the classis has power to license, ordain, suspend and depose ministers, to form congregations and to supervise the teaching of doctrines therein, and while no pastor can be called or dismissed to another congregation without its consent, can it be supposed that the power to dissolve the pastoral relation is lodged nowhere?

There are numerous reasons not affecting the religious or moral character of a pastor, such as the condition of his family, his own weaknesses, foibles, manners, eccentricities, infirmities of temper or mere indiscretions, which might render his services ineffectual for good and possibly productive of evil in a congregation. In such cases the exigencies may be such that the very life and existence of the church depend upon his removal. Strife and bitterness may have been so far engendered that they are irreconcilable. The flock may have been so far scattered and diminished that the consistory cannot pay the pastor's stipulated salary. What is to be done in such case? As I understand the claim of Mr. Connitt, there is no remedy unless the pastor will consent to a dissolution of the pastoral relation; the consistory

alone cannot effect it, and there is no jurisdiction in any of the church judicatories to effect it. I cannot assent to this claim. Considering the general frame of the church government, the objects to be attained thereby, the distribution and division of the various powers among the several judicatories, and the oversight and care of the churches within its bounds conferred upon classis, I am of opinion that the classis of Orange decided correctly that it had inherent power to dissolve the pastoral relation between a pastor and his congregation.

No complaint is made by Mr. Connitt that the classis was not properly organized, or that he was not afforded a sufficient opportunity to be heard. The controversy seems to have been fully examined, and all parties were fully heard in some stage of the proceeding, although Mr. Connitt did not appear before the classis. So far as I can discover, the only ground of complaint he made then, or which his counsel makes for him now, is that the classis dissolved the pastoral relation on the ground of expediency, which it did not have the constitutional right to do. But what is meant by "expediency" in this connection, it is not easy to determine. It is a word of quite general and indefinite meaning. It would be in the highest degree expedient to dissolve the pastoral relation if the pastor were guilty of any offence against morality or religion. Is it less so if his conduct and characteristics be such that the continuance of the pastoral relation will "endanger the very existence of the church" placed under his charge? If, for any reason, the pastoral relation ought to be dissolved, it would be inexpedient to continue it. I suppose, however, that the claim of Mr. Connitt is, that the pastoral relation could be dissolved by classis only after the pastor had been tried for some offence affecting his religious or moral character, of which an ecclesiastical judicatory could take cognizance. But I find no such limitation impliedly or expressly in the constitution, and for reasons which I have stated I do not believe it to exist. The relation of a pastor to his congregation, and the man-

ner in which he discharges his duties, involving the spiritual welfare of his congregation and to some extent the character of the church organization to which he is attached, are subjects of ecclesiastical jurisdiction. Whether a man shall be ordained as a minister, whether a pastor shall be called, dismissed, suspended or deposed, and whether his pastoral relation to any particular congregation shall be continued or terminated, are ecclesiastical matters, to be disposed of, in the Reformed Church, in the ecclesiastical judicatories in an ecclesiastical way.

I have thus far endeavored to show that the classis had jurisdiction to make the decision; but it was decided in the celebrated case of *Chase* v. *Cheney* (10 Am. Law Reg. [N. S.], 295) that the decision of an ecclesiastical court upon an ecclesiastical matter as to its own jurisdiction is conclusive upon the civil courts. Thornton, J., writing the opinion of a majority of the court, says: "The civil courts will interfere with churches or religious associations when rights of property or civil rights are involved; but they will not revise the decisions of such associations upon ecclesiastical matters merely to ascertain their jurisdiction." In the case of *Watson* v. *Jones* (13 Wallace, 679–733), Mr. Justice Miller, in a very learned opinion, expresses the same opinion. While I am not prepared to assent fully to the views of these learned judges, yet I am of opinion that in all cases of doubt, when there is not clearly an absence of jurisdiction, the decisions of' church judicatories as to their own jurisdiction in ecclesiastical matters should receive great weight. In this case there was first the action of the classis, then of the particular synod, and, on further appeal, of the general synod; judicatories composed of men learned in the constitution, laws and usages of the church, and they all decided with great unanimity, after full hearing and investigation, that the classis had jurisdiction and made a proper decision. If I were less certain than I am as to the question of jurisdiction, I should give great weight to the decisions of these bodies.

Having thus reached the conclusion that this was an ecclesiastical matter, and that the church judicatories had jurisdiction

of it, we cannot inquire whether they have proceeded according to the laws and usages of their church, nor whether they have decided the matter correctly. It is the settled law of this country, repeatedly announced by the most learned judges and highest courts, that in such cases the civil courts must take the decisions of the ecclesiastical courts as final and binding upon the parties. As said by Judge MILLER, in *Watson* v. *Jones* (*supra*): "In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and State under our system of laws, and supported by a preponderating weight of judicial authority, is that whenever the questions of discipline, or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them in their application to the cases before them." In *German Reformed Church* v. *Seibert* (3 Bar., 291), it is said by the court: "The decisions of ecclesiastical courts, like every other judicial tribunal, are final, as they are the best judges of what constitutes an offence against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals." In *Harmon* v. *Duher* (2 Speers Eq., 87), Chancellor JOHNSON says: "When a civil right depends upon an ecclesiastical matter, it is the civil court and not the ecclesiastical which is to decide; but the civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them." These views are fully sustained by the courts of our own State. (*Dutch Church of Albany* v. *Bradford*, 8 Cowen, 456; *Walker* v. *Wain-*

*right,* 16 Barb., 486; *Robertson* v. *Bullions,* 9 Barb., 64; *Dieffendorf* v. *Reformed Calvinist Church,* 20 John., 12.)

I have purposely abstained from discussing the question whether the decision of the classis and the other judicatories was right, that is, in accordance with the constitution, laws and usages of the church, because of the view I have taken that those judicatories had jurisdiction of the subject-matter, and, hence, that we are not to review their decision, but to take it as final and binding; but I will refer briefly to two or three matters to which our attention has been called. In 1806 the following question was proposed for answer to the general synod: "Has any classis a power to dissolve a connection between a minister and his congregation or congregations merely on the ground of expediency, though one of the parties be wholly averse to the dissolution " And it was answered in the affirmative. In 1809 the general synod adopted the following resolution: "Resolved, That the reso_lution passed in general synod in 1806, authorizing classis to dissolve the connection between ministers and their congregations on the principle of expediency, though one of the parties be averse to such dissolution, be repealed, because unconstitutional and of an evil tendency, calculated to foster strife in congregations, to encourage worldly-minded professors, to excite animosities in a church against ministers, and repugnant to the practice of the Reformed Church in all ages." Here are two conflicting declarations as to the power of the classis, by the general synod, and it appears from the subsequent action of the general synod that there is still some difference of opinion upon the same question in the church; but in this case we have the decision of the general synod acting judicially, after a hearing of both sides, that the classis had the power to dissolve the pastoral relation. It may be that the general synod came to the conclusion judicially that the declaration of 1806 was right, and that of 1809 was erroneous; or it may be that it was of the opinion that in this case, the fact being found that the continuance of the pastoral relation "endangered the very existence of the church" at New

Prospect, it was not a question of mere expediency, but of a much more serious and substantial character. The general synod of 1809 did not declare that it was unconstitutional and repugnant to the practice of the reformed church in all ages for the classis to dissolve the pastoral relation against the consent of one of the parties. It could not have done this, because such power was possessed by classis in all ages from the synod of Dordrecht in 1618 and 1619. It was simply a declaration that classis could not dissolve the pastoral relation for mere expediency, and it was still left for the church judicatories to determine, even under that resolution, what was a case of mere expediency; and if, upon that question, any inferior judicatories made a mistake, the only remedy the party aggrieved had was by appeal.

Our attention has been called to the following cases as in conflict with the views above expressed: *Smith* v. *Nelson* (18 Vt., 511); *Austin* v. *Searing* (16 N. Y., 112). The former case, so far as it purports to lay down the law as to the effect of the decisions of ecclesiastical judicatories upon ecclesiastical matters submitted to them, under the constitution, laws and usages of the church organizations for which they are constituted, is in conflict with the general course of judicial decisions everywhere in this country. The latter case involved only a dispute about property; and in the opinions written, the cases as to the effect of the decisions of ecclesiastical judicatories were in no way criticised, questioned or even referred to.

By the express terms of the call, Mr. Connitt was to receive his salary only so long as he should continue the pastor of the church, and his pastoral relation having been properly dissolved on the 3d of May, 1869, his salary ceased from that time, unless there is some ground for the further claim made by the appellants, that the consistory representing the congregation have the right, notwithstanding the action of classis, to continue the salary; and this brings us to the next question, who were the consistory of the church? It is provided in section 2 of the "act to provide for the

incorporation of religious societies," passed in 1813, that the minister, elders and deacons of every Reformed Protestant Dutch Church, elected according to the rules and usages of such churches, shall be the trustees for every such church or congregation. And the constitution of the church, chapter 1, article 3, section 4, provides that in churches already organized " the consistory for the time being, as representing all the members, may choose the whole consistory, and refer the persons thus chosen by publishing them in the church for the approbation of the people." It is further provided in chapter 2, article 2, section 4, that the elders and deacons shall be chosen annually, and the result of such election shall be published in the church three successive Sabbaths, that all lawful objections may be made to be considered by the consistory before their ordination; and that a majority of the consistory, regularly convened, shall be a quorum, and in like manner a majority of ministers and elders, and also a majority of deacons so convened, shall be a quorum for the transaction of business. When the minister is present he is to preside at meetings of the consistory, and, in his absence, an elder must preside, and the consistory may prescribe the mode and time of calling their meetings. These are all the provisions of statute or church law to which it is important to call attention. The court was asked to determine who were the consistory of the church. This involves an inquiry, not as to a *de facto* consistory, but as to the *de jure* consistory. All the parties being before the court, the question for the court to determine is not who act or have been acting as elders and deacons, but who have the right to act as such and thus constitute the consistory.

In 1868 Parliman, Daniel M. Schoonmaker, Evans and Whitten were elders, and Thompson, Albert Schoonmaker, Terwilliger and Niver were the deacons, and they were all confessedly in office January 24, 1869. On that day Parliman, Schoonmaker and Evans, elders, and Thompson, Terwilliger and Schoonmaker, deacons, caused to be read to the congregation the declaration above referred to, declining

"from this time forth to act as elders and deacons under the present pastor." After that date, and prior to April twenty-one, these elders and deacons did not attend any meeting of the consistory, and, so far as appears, did not act as members of the consistory. But, between January twenty-four and April twenty-one, three formal meetings of the consistory seem to have been held, at all of which the pastor attended, with Elder Whitten at one, and Deacon Niver at one, and both the elder and deacon at another. For the want of a quorum no business was transacted at any of these meetings. Finally, on the twentieth of April, the pastor presented to classis the memorial setting forth the refusal of the other elders and deacons to serve, which is above referred to, and invoking its action. This paper was subsequently withdrawn, and, on the twenty-first day of April, the pastor presented to classis formal charges against these elders and deacons, describing them by their names of office as constituting a majority of the consistory, and charging them, among other things, with faithless desertion of office, for refusing to meet with the consistory, and declining to serve in their respective offices. Upon these charges the classis took action, and on the third day of May disposed of them by recommending these elders and deacons to resume their official duties, and on the same day they dissolved the pastoral relation. After this action, on the seventh day of May, Parliman, Schoonmaker and Evans, elders, and Thompson, Schoonmaker and Niver, deacons, met in the lecture-room of the church, claiming to act as a consistory, and, reciting the action of the classis, resolved again to enter upon the discharge of their duties as a consistory, and directed the collectors to collect the subscriptions to the salary of the pastor up to the first of July, and then adjourned. From that time forth they have endeavored in all ways to act as a consistory and to take charge of the church. They collected the subscriptions to the salary, and, on the twenty-first day of May, paid to Mr. Connitt the balance due him upon his salary to the third day of May; he, however, refusing to recognize them as a con-

sistory. Mr. Connitt, notwithstanding the action of the classis, refused to recognize them as the consistory, and still claimed to be and to act as the pastor of the church. He retained the records and key of the church, and officiated therein against the protest of Parliman and his associates. On the fourth of July Mr. Connitt gave notice, from the pulpit of the church, that there would be a meeting of the consistory on the following day for the purpose of appointing a new consistory. On that day he and Deacon Niver met, claiming to act as a consistory, and declared the offices of the three elders and the three deacons vacant, and appointed Hiram Niver and James C. Ecker elders in the place of Parliman and Schoonmaker, and Justus Baker deacon in the place of Albert Schoonmaker. Thereafter, on three successive Sabbaths, Mr. Connitt published notice in the church of the election of these persons, and on the twenty-fifth day of July he, in form, installed them into their offices; and, thereafter, they claimed that they, with Mr. Connitt and John A. Niver, were the consistory of the church. Parliman and his associates continued to claim that they were the consistory, and to act as such; and, on the nineteenth day of July, Parliman having been elected by the one consistory as a delegate to the classis, was, against the objection of Mr. Connitt, after examination of his credentials, admitted to represent the church in the classis. I have thus called attention to sufficient facts to present the question for consideration.

The paper caused to be read in the church by Parliman and his associates did not vacate their offices. Whether it should operate as a formal resignation depends upon the intention of the parties concerned. It was simply read; was not delivered or filed. It was read to the congregation, and not to the consistory at a formal meeting. As they owed their election to the consistory, their resignation should probably have been made to that body, and should have been accepted by it. (A. & A. on Cor., 424.) It is quite clear that it was not intended as a formal resignation; Mr. Connitt

did not so understand it, for he subsequently, so long as he remained the pastor of the church, recognized them as still retaining their respective offices. He brought the matter to the attention of the classis, and after its recommendation they resumed the discharge of their duties. An absolute refusal to serve in an office, made under such circumstances as to show an absolute intention to abandon the office, may, if accepted and acted on, amount to a resignation. But every refusal to serve or to discharge the duties of an office, clearly cannot have this effect. An officer or trustee who refuses to perform the duties of his office may be removed and his office thus vacated. But his mere refusal cannot often have such effect. Here there was not an absolute refusal. All parties so understood it. It was merely, for reasons sufficiently apparent, a refusal to serve under Mr. Connitt. For this refusal they could have been disciplined by the church authorities, if upon trial it was found to be unjustifiable or unreasonable. Mr. Connitt tried this course, and the classis dismissed the charges, and recommended them to resume their official duties. Hence I am of opinion that Mr. Parliman and his associates did not vacate their offices; and the action of Mr. Connitt, after he ceased to be pastor of the church, and of Deacon Niver, in first declaring that the offices were vacant, and then filling them, was wholly nugatory. Mr. Connitt was no longer pastor, and, therefore, not a member of the consistory; and in no event could one member of the consistory fill up any vacancies in the consistory or transact alone any of the business of a regular consistory. The consistory claimed to have been elected by Mr. Connitt and Mr. Niver never became a *de facto* consistory, because during the whole time there was a *de jure* consistory claiming to act, and, so far as they could, with the obstacles thrown in their way, acting as such.

I have thus reached the conclusion that Mr. Connitt ceased to be the pastor of the church on the 3d day of May, 1869, and that his salary ceased from that time, and that Mr.

Parliman and his associates were the consistory of the church, and these conclusions leave nothing further for discussion.

The judgment of the General Term must be affirmed, with costs.