Saint Nicholas Cathedral of the Russian Orthodox Church in North America, Appellant, against John Kedroff and Benjamin Fedchenkoff, as Archbishop of the Archdiocese of North America and the Aleutian Islands of the Russian Orthodox Greek Catholic Church, Respondents.

Argued February 24, 1953; decided July 14, 1953.

*Philip Adler* for motion.

*Ralph Montgomery Arkush* opposed.   I. Plaintiff tried the action on a twofold theory (a) that at common law the administrative autonomy of the North American district of the Russian Orthodox Church was originally justified by virtue of the ukase of November 20, 1920, and is still justified by political conditions in Soviet Russia, and (b) that the New York Legislature had recognized these facts and confirmed plaintiff's rights by the enactment of article 5-C of the Religious Corporations Law. II. The courts below erred, as matter of law, in their treatment of plaintiff's common-law theory.   III. The decision of the Court of Appeals was based solely on the statute and the United States Supreme Court made no decision on the common-law theory.   IV. The United States Supreme Court made no ruling which would bar the courts of this State from adjudicating the case upon its merits and upon established common-law principles.   Plaintiff is entitled to a new trial.

CONWAY, J.   The decision of this court in *St. Nicholas Cathedral* v. *Kedroff* (302 N. Y. 1), directing judgment in favor of the plaintiff, i.e., the group known as the "Russian Church in America," has been reversed by the Supreme Court of the

United States in a majority opinion written by Mr. Justice REED, and the case has been remanded to this court " for such further action as it deems proper and not in contravention of this opinion." (*Kedroff* v. *St. Nicholas Cathedral,* 344 U. S. 94, 121.) On the basis of such reversal and remand, the defendants-respondents, i.e., the appointees of the Moscow Patriarchate, now move, in substance, for an order directing final judgment in their favor. Adjudication of the motion requires a re-examination of the grounds and rationale of our decision and the extent to which it has been affected by the action of the Supreme Court.

The majority opinion in this court very clearly divided consideration of the case under two heads — one statutory and the other common law. It was held that error, in any event, had been committed below, and that, under common-law principles, a new trial would be required, but that, under the statute, which was deemed controlling, final judgment for plaintiff was mandatory. Amendment of the remittitur was granted to make clear that the ultimate basis for the decision was the statute and that a contention that such statute was unconstitutional had been rejected (302 N. Y. 689). Thereupon the Supreme Court entertained the case and eventually, in an opinion, decided that the statute, as construed and applied by this court, did indeed constitute a violation of the constitutional right to the free exercise of religion, and accordingly, as above noted, returned the matter to us for such further action as we might deem proper and not in contravention of the said opinion. With the statutory phase of the case thus authoritatively eliminated, we are left with the alternative common-law base, which still stands as the basis for future action.

The foregoing is a simplified summary of what we conceive to be the present status of the case. We shall now discuss these views in more detail.

The prevailing opinion in this court, reported in 302 New York at pages 1 to 33, contains an extended review of the origins of this controversy — the history of the Russian Orthodox Church, the founding of the North American Diocese, and the consecration of St. Nicholas Cathedral as the see, the Bolshevik revolution, the persecution, suppression and virtual extinction of the church in Russia by the Soviet Government (pp. 4–9),

the patriarchal ukase of 1920 authorizing diocesan bishops to assume full hierarchal power in the event of cessation of the highest church administration in Moscow, subject to confirmation by such authority upon its re-establishment (p. 7), the prior litigations here (pp. 10–15), the renewed activity of the Moscow Patriarchate and the sobor of 1945 (p. 17), the unsuccessful efforts at reconciliation (pp. 17–18), and the commencement of this action (pp. 19–21).

For over twenty years prior to the commencement of this action, St. Nicholas Cathedral — the historical and traditional see of the Russian Orthodox Church in North America — had been occupied by John S. Kedrovsky and his family (302 N. Y., at pp. 4, 12, 16). Kedrovsky was not a cleric of the Russian Orthodox Church, but rather of the short-lived " Renovated " or " Living Church ", which had been created and supported by the communists in Russia as a divisive influence in the campaign against religion after the Bolshevik revolution, and which purported to assume control of the church abroad. Everyone now admits and agrees that this " Renovated Church " was uncanonical and had no standing whatever. Nevertheless, by judgment of the Appellate Division in 1925 (214 App. Div. 483), affirmed by this court without opinion in 1926 (*Kedrovsky* v. *Rojdesvensky*, 242 N. Y. 547), Kedrovsky wrested possession of the cathedral from Archbishop Platon, the true head of the North American Diocese who had been appointed as such by Patriarch Tikhon. That decision, incidentally, was supported on the ground that the occupant of the cathedral must be an appointee of the central church authorities in Russia and that Kedrovsky, not Platon, was the current appointee of the authorities then existing, viz., the " Renovated Church ". This, we think, is an illustration of the difficulty in applying a mechanical test in such a situation without full examination and proof as to the nature of the so-called " central church authorities ". The courts, perhaps, were then too close in point of time to realize what had really occurred in Russia and they did not have access to the facts now available. In retrospect, however, and with the knowledge born of aftersight, it is now apparent that, by virtue of that decision, the rightful occupant was ousted from the cathedral and its administration and possession turned

over to a schismatic whose sect actually became extinct after a few years as is admitted by both parties herein.

Faced with this usurpation of the authority of the original patriarchal central church, and with the diocese in chaos and confusion, threatened with the loss of its temporalities to schismatics such as Kedrovsky, Archbishop Platon convened an American sobor and the administrative autonomy of the new North American metropolitan district was declared (302 N. Y., at pp. 11–12). This action was taken in pursuance of Patriarch Tikhon's ukase No. 362 of 1920, a remarkably prescient document, which contained instructions for diocesan bishops in case the activity of the highest church administration should stop and in case the cessation of activity should acquire " ' a protracted or even permanent character ' ". In that event, the diocesan bishop was officially empowered to " ' organize the diocesan administration suitable to conditions created ' ", with the proviso that " ' all measures that were taken locally in accordance with the present instructions  *  *  *  must be submitted for confirmation later to the Central Church Authority when it is re-established.' " (302 N. Y., at p. 7.) The American sobor, in establishing the metropolitan district, stated that the " ' final regulation ' " of the status of the North American church was to be left to a " ' future Sobor of the Russian Orthodox Church which will be legally convoked, legally elected, will sit with the participation of representatives of the American Church under conditions of political freedom  *  *  *  and will be recognized by the entire Oecumenical Orthodox Church as a true Sobor of the Russian Orthodox Church.' " (302 N. Y., at p. 12.)

Two years after our affirmance in the *Cathedral* case (*supra*) we declined to follow such decision to its logical conclusion. In *Kedrovsky* v. *Russian Catholic Church* (249 N. Y. 75) we reversed a judgment which had directed Platon and the others in the metropolitan district to turn over to Kedrovsky all the properties and deeds of the new metropolitan district. Realizing that the legitimate claims of the new metropolitan district, whose temporary administrative autonomy had but recently been declared, were entitled to consideration, and " In view of the dissensions that have arisen ", we returned the case to our Supreme Court, leaving it to that court, after full consideration

of the facts, and in the exercise of its discretionary power, to achieve a result whereby the faithful of the Russian Orthodox Church in this country might continue to enjoy their accustomed religious temporalities under the supervision of trustees who might " be relied upon to carry out more effectively and faithfully the purposes of this religious trust " (pp. 77–78).

Finally, the autonomous status of the metropolitan district, based upon the above-described ukase of 1920, was expressly sustained in *Waipa* v. *Kushwara* (259 App. Div. 843, motion for leave to appeal denied 283 N. Y. 780).

The instant action was commenced by the plaintiff corporation, St. Nicholas Cathedral of the Russian Orthodox Church in North America, as the holder of the record title to the cathedral premises. The corporation was created in 1925 by special act of the Legislature, and was composed of Platon and others of the metropolitan district. It is now controlled by and represents Archbishop Leonty, the successor, in December, 1950, of Archbishop Theophilus, who was elected as Platon's successor as head of the metropolitan district. (The election of Leonty had not taken place at the time of our first opinion which mentioned Theophilus as head of the metropolitan district.) While the corporation continued to hold title to the cathedral down through the years, the cathedral itself was occupied by Kedrovsky (by virtue of the aforesaid judgment in 242 N. Y. 547 which we disregarded in 249 N. Y. 75) until his death in 1934, and the metropolitan district was *enjoined* from interfering with such possession. Kedrovsky's son, Nicholas, remained in and occupied the cathedral from 1934 until 1944, when he too died, at which time possession of the cathedral passed informally to his brother, John Kedroff, whose only status was that of a priest in the concededly extinct " Renovated Church ".

Meanwhile, following a period of several years during which the central or patriarchal church had virtually ceased to exist, one Sergius made a compact with the Soviet Government and was appointed acting *locum tenens* of the patriarchal throne in 1927 (302 N. Y., at p. 15). Sergius, in 1934, appointed Benjamin as " ' permanent Ruling Bishop of the Russian North American Diocese ' ", *the order reciting* that Benjamin had " ' organized in New York a Diocesan Council and that our North American

Diocese has *begun* official existence ' '' (302 N. Y., at pp. 15–16). During all the period from his appointment in *1934* for the purpose of forming such *new* diocese down to the commencement of the instant action in *1945,* it does not appear that Benjamin asserted any claim to occupancy of the cathedral or took any action to recover possession of it, which conduct may be said to constitute a practical interpretation of his authority as contained in his appointment in forming a new or different diocesan council and North American Diocese.

The present action is in ejectment and was commenced in 1945, as above stated, against John Kedroff, the second son of John S. Kedrovsky, the said Kedroff having taken possession of the cathedral informally on the death of his father and brother *without benefit of appointment by anyone.* It being quite obvious that Kedroff, on these facts, would not have been able to retain possession of the cathedral as against the claim of plaintiff and of Theophilus, the then bishop of the metropolitan district, and indeed could not put in any defense, he (Kedroff) *after the commencement of this action* requested reordination as a priest by Benjamin in the latter's new diocese. (302 N. Y., at p. 20.) Following his reordination by Benjamin in the latter's new diocese, Kedroff purported to '' give '' the cathedral to Benjamin who was then permitted to intervene in this action (302 N. Y., at pp. 20–21). Benjamin then occupied the cathedral from October, 1945, until June 6, 1947, when, in order to obtain an adjournment of this action, *he agreed to give up possession of the cathedral* (302 N. Y., at p. 21). At the time of trial, Benjamin was living at 38 Halsey Street in Brooklyn.

In our opinion we also took note of the general common-law principle developed in the American courts, and notably expressed in *Watson* v. *Jones* (13 Wall [U. S.] 679, 724–727) and in our own case of *Trustees of Presbytery of N. Y.* v. *Westminster Presbyt. Church* (222 N. Y. 305, 315) and our statute, Religious Corporations Law (§§ 4, 5), that in a central or denominational church, the decision of the highest church judicatories will be accepted as final and conclusive by the civil courts (p. 13). Mention was made on page 21 of the controlling effect we were subsequently to ascribe to the new article 5-C of the Religious Corporations Law, and then we stated (pp. 21–22):

" Quite apart from this legislative action with respect to the specific dispute here involved, we think that, as a matter of common law as intimated by our 1928 decision in *Kedrovsky* v. *Russian Catholic Church* (249 N. Y. 75, *supra*), there was ample basis and room for an exercise of the discretionary power of the Supreme Court over the conduct of trustees, in favor of the North American metropolitan district. We think that in the light of historical facts and the evidence in the records before us, the conclusion would have been fully warranted that the leaders of the North American metropolitan district are the trustees ' who may be relied upon to carry out more effectively and faithfully the purposes of this religious trust ' (pp. 77–78), i.e., who may administer the temporalities of St. Nicholas Cathedral for the benefit of the faithful for whose use it was originally dedicated.

" The courts below, in granting judgment herein to defendants, did not determine, in the exercise of their discretion, whether defendants could be relied upon to carry out faithfully and effectively the purposes of the religious trust. The *Westminster* and *Watson* cases (*supra*), were cited and the conclusion drawn that St. Nicholas Cathedral must be occupied by an archbishop appointed by the central authorities in Moscow and that Benjamin, who was so appointed, was therefore entitled to the possession of the cathedral. This, we think, was error. The determinative issue in the case, apart from the action of the Legislature with respect to the problem, was whether there exists in Moscow at the present time a true central organization of the Russian Orthodox Church capable of functioning as the head of a free international religious body. If the Moscow patriarchal throne has been resurrected by the Soviet Government solely as a means of influencing opinion at home and abroad, and if it may now operate on an international scale, not as a true religious body, but only as an extension or implementation of Russian foreign policy, then it is clear that the North American metropolitan district and not the appointee or ambassador of the central authorities in Moscow, is the proper trustee to manage for the benefit of the faithful in this hemisphere those religious temporalities dedicated to the use of the Russian Orthodox Mission and Diocese prior to 1924

when it became an administratively autonomous metropolitan district."

And later removing any possibility of ambiguity as to our thoughts on this branch of the case, we said (p. 24) : " In short, we think that further inquiry might well have been made into the present status of the patriarchate in Russia and we think the Supreme Court should have determined, in the exercise of its discretion, whether Benjamin, the appointee of the central church authorities in Moscow, or Metropolitan Theophilus, the archbishop of the North American metropolitan district, was the proper person to administer the temporalities of St. Nicholas Cathedral and whether he was the proper trustee ' who may be relied upon to carry out more effectively and faithfully the purposes of this religious trust (*Carrier* v. *Carrier*, 226 N. Y. 114).' (*Kedrovsky* v. *Russian Catholic Church*, 249 N. Y. 75, 77–78, *supra*.) That was not done because it was thought that the cases of *Watson* v. *Jones* (13 Wall. [U. S.] 679, *supra*), and *Trustees of Presbytery of N. Y.* v. *Westminster Presbyt. Church* (222 N. Y. 305, *supra*) required a decision in favor of defendants and that the earlier case of *Kedrovsky* v. *Rojdesvensky* (242 N. Y. 547, *supra*), was determinative of some phases of the problem. Our views on this aspect of the controversy would require reversal and the ordering of a new trial so that the Supreme Court might exercise its discretion along the lines herein indicated. It is unnecessary, however, to discuss that further, for there is another ground requiring reversal here and judgment in favor of plaintiff and the North American metropolitan district which it represents."

Thus, in so many words, we announced that, in the absence of the statute, we would order a new trial at which findings might be made and discretion exercised, concerning the existence and status of the central church authorities in Moscow and their ability to carry out effectively and faithfully the purposes of the religious trust.

Although the prevailing, concurring and dissenting opinions in this court adverted in detail to the constitutional arguments presented in connection with the statutory branch of the case (pp. 29–33, 35, 42–43), it was necessary for defendant to request amendment of the remittitur to make it clear that such constitu-

tional question had been necessarily determined. We were careful in amending the remittitur to limit the constitutional objections solely to the statutory phase of the case. Thus, we said (302 N. Y. 689, 690): " * * * Upon this appeal there was presented and necessarily passed upon a question under the Constitution of the United States, viz.: whether article 5-C of the Religious Corporations Law, as construed by this court, violated any rights of the defendants guaranteed by the First and the Fourteenth Amendments to the Constitution of the United States. This court held that the aforesaid statute did not violate any of the rights of the defendants guaranteed by those amendments to the Constitution of the United States."

After argument and submission of the case, the Supreme Court ordered reargument and specifically requested counsel to include a discussion of whether the judgment might be sustained on State grounds (343 U. S. 972). It was only after both parties concluded that it could not be so sustained (because it depended upon the constitutionality of the statute) that the Supreme Court considered the constitutional issue on the merits. Thus the court said (344 U. S. 94, 97): " Because of the constitutional questions thus generally involved, we noted probable jurisdiction, and, after argument and submission of the case last term, ordered reargument and requested counsel to include a discussion of whether the judgment might be sustained on state grounds. 343 U. S. 972. Both parties concluded that it could not, and the unequivocal remittitur of the New York Court of Appeals, 302 N. Y. 689 * * * specifically stating the constitutionality of the statute as the necessary ground for decision, compels this view and precludes any doubt as to the propriety of our determination of the constitutional issue on the merits. *Grayson* v. *Harris,* 267 U. S. 352; *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95. The case now has been reargued and submitted."

We mention this because it makes clear that the only basis for the appeal to the Supreme Court of the United States was our conclusion that the statute had controlling effect and that it was not unconstitutional.

Mr. Justice REED, delivering the opinion of the court, made express mention of our alternative, nonlegislative basis for

decision. He pointed out that we had considered " ' whether there exists in Moscow at the present time a true central organization of the Russian Orthodox Church capable of functioning as the head of a free international religious body ' " and he noted that we had " concluded that this aspect of the controversy had not been sufficiently developed to justify a judgment upon that ground. 302 N. Y., at 22–24 " (344 U. S., at p. 106).

He then proceeded upon the *assumption* that the prerevolutionary authority and paramount jurisdiction of the Moscow Patriarchate over the American church has continued without change and without interruption down to the present day. In the light of this assumption, Justice REED then considered the narrow question of the legislative power of New York to enact article 5-C of the Religious Corporations Law, as that statute was construed by us. His opinion throughout refers to this *legislative* aspect of the controversy. Thus, he says that our determination " was made on the authority of Article 5-C " (p. 97), that " Article 5-C is challenged as invalid " (p. 100), that this court " depended for its judgment * * * upon Article 5-C " (p. 106) and he concluded for the Supreme Court that " we think that the statute here in question passes the constitutional limits " (p. 107), that " Such a law violates the Fourteenth Amendment " (p. 107), and that it constituted " a transfer by statute of control over churches " (p. 110). Later, in the concluding and determinative portion of the opinion entitled " *Legislative Power* ", he rejected our conclusion as to " legislative power over religious organizations " (pp. 117, 118), he distinguished the *American Communications Assn.* v. *Douds* case (339 U. S. 382) (pp. 118, 119) and repeatedly returned to the theme that the statute in question, article 5-C, was beyond the legislative power of the State of New York and violated the Constitution rule against prohibition of the free exercise of religion (pp. 120, 121).

Thus, we feel that the Supreme Court, in its decision, did *not* determine the constitutional validity of the alternative common-law disposition of the case previously announced by this court, viz., that, apart from the statute, a new trial would be ordered so that our State Supreme Court, under proper instructions, might ascertain all the facts of the controversy and render appropriate findings and exercise of discretion thereon.

Accordingly, we adhere to our prior decision, apart from the statute, to order a new trial upon the issues here involved. Since we have previously, publicly and categorically expressed our considered conclusion that such action would be required in the absence of the statute, and since the statute has been expunged from the case, it would be unreasonable to take a different position now, unless we were compelled to do so by the action of the Supreme Court. We have already shown that the actual decision of that court relates solely and exclusively to the constitutional validity of article 5-C and does not, in terms, affect our conclusions on the nonstatutory aspect of the controversy. Mr. Justice REED, however, did include in his opinion an extended discussion (pp. 110–116) of the case of *Watson* v. *Jones* (13 Wall. [U. S.] 679, *supra*) which introduced into the law of America the principle that in a central, denominational or hierarchal church, the decision of the highest church authority or tribunal, will be accepted as final and conclusive by the civil courts. He conceded that the principle, as announced, was not a constitutional pronouncement, and could not have been (p. 115). He continued with the comment that (p. 116): " * * * The opinion radiates, however, a spirit of freedom for religious organizations, an independence from secular control or manipulation — in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. *Freedom to select the clergy, where no improper methods of choice are proven,* we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference."

It can hardly be said that this passing comment, unnecessary to the actual decision of the court upon the validity of article 5-C, has the effect of elevating the rule of *Watson* v. *Jones* (*supra*) to the dignity of a constitutional mandate binding upon all the courts of the land. There is no indication that the Supreme Court, by its decision herein, intended to make a pronouncement of such major proportions.

Nevertheless, whether *Watson* v. *Jones* (*supra*) be viewed as a common-law or constitutional rule, there is still some area in which the civil courts can and must operate in controversies submitted for adjudication. Justice REED himself implied as much with his qualification that the rule is operative only

" where no improper methods of choice are proven " in the selection of the clergy, of whom, of course, Benjamin is one.

Whatever other limitations have been or will be placed upon the rule of *Watson* v. *Jones* (*supra*), there is one basic qualification to its application. That is that the highest church authority or tribunal, whose decision is to be accorded final and conclusive effect, must in truth and fact be capable of functioning freely with its activities directed by churchmen in the interests of the church and in accordance with the organic law of the church. In other words, where a *property right* turns upon a decision of the church authority, the civil court is under a duty, if such issue is raised, to ascertain whether the purported authority is duly constituted and functioning. The court is not required, without investigation and in unquestioning obedience to a legal formula, to give conclusive effect to the determinations of any group which purports to exercise authority, particularly as against the contention that the claimed authority is being subverted to secular and irreligious ends.

In the instant case as we noted in our original opinion (302 N. Y., at p. 22) : " We know that a nominal church organization exists in Russia, but that is not enough ", in view of the position steadfastly maintained by the plaintiff that the central church authority " has been absorbed by the Russian Government and its action deprived, during the period of such domination, of any religious significance." (P. 24.) To reject the claim of the plaintiff in this regard, without hearing and weighing· all the evidence, would be grossly unjust and would constitute an infringement of their right to free exercise of religion. Uncritical acceptance of the principle of *Watson* v. *Jones* (*supra*) without qualification, as to " improper methods of choice " of clergy (344 U. S., at p. 116) under the circumstances here involved, does not advance the end of religious liberty but rather retards it, for in effect the court would be requiring the communicants of the metropolitan district to acknowledge the administrative rule of persons whom they believe are mere puppets of a monolithic and atheistic secular power, if such communicants wish to continue to use the religious temporalities they have so long enjoyed.

With respect to the new trial now to be had, there can be no doubt that the plaintiff *corporation* which holds *title to the*

*cathedral premises* is entitled to *possession* thereof. Likewise, we think, there can be no doubt that the trustees of the corporation, who are now members of the North American metropolitan district, are charged with the duty of caring for and maintaining the property. There is also no doubt that the said trustees must administer these temporalities in accordance with and subject to the '' denominational '' usage whatever that may be held to be, and for the beneficiaries for whom the trust was originally created.

Section 5 of the Religious Corporations Law provides that the '' trustees of every religious corporation shall have the custody and control of all the temporalities and property, real and personal, belonging to the corporation and of the revenues therefrom, and shall administer the same in accordance with the discipline, rules and usages of the corporation and of the ecclesiastical governing body, if any, to which the corporation is subject  *  *  *.''

For the purpose of the case at bar, the question of the proper administration of the cathedral trust by the trustees of the plaintiff corporation comes down to which of two clerics — Leonty or Benjamin — is to be put into possession of the edifice.

A line of cases in this court supports the proposition that the civil courts of this State have jurisdiction in equity to inquire into and determine whether trustees of a religious corporation owning realty are properly administering the real property in accordance with the terms of the trust.

We stated in *Westminster Prebyt. Church* v. *Trustees of Presbytery of N. Y.* (211 N. Y. 214, 224–225) : '' Upon the trial of the action the plaintiff proved all the facts necessary to make out a *prima facie* case in ejectment. It proved title, possession and ouster by the defendant.  *  *  *  The plaintiff having legal title to the property was entitled to the possession thereof so far as appeared from any evidence properly in the record. If, as the defendant asserts, the trustees of the plaintiff corporation are not administering the property in accordance with denominational usage, the Presbytery [defendant] has an adequate remedy in equity to compel them to do so  *  *  *.''

This principle of civil jurisdiction to review the administration of religious trusts was mentioned again in *Trustees of Presby-*

*tery of N. Y.* v. *Westminster Presbyt. Church* (222 N. Y. 305, 318, *supra*), and again, in the above-noted case of *Kedrovsky* v. *Russian Catholic Church* (249 N. Y. 75, 77–78) a prior litigation affecting the cathedral and similar issues. In the latter case, we stated (pp. 77–78): " In view of the dissensions that have arisen, the Supreme Court may well conclude that the title should be vested in some other trustee who may be relied upon to carry out more effectively and faithfully the purposes of this religious trust (*Carrier* v. *Carrier*, 226 N. Y. 114)."

In the case at bar, it appears obvious that the cathedral was dedicated for the use and benefit of the faithful in the old North American Diocese of the Russian Orthodox Church. Prior to the death of Patriarch Tikhon, the last Patriarch who had unquestionable authority in every respect, the proper administration of the trust demanded that the trustees permit the cathedral to be occupied and governed by the appointee of the Patriarch. But, in view of the undeniable break in the patriarchal succession and the virtual extinction of the Patriarchate after the Bolshevik revolution, in view of the patriarchal ukase of 1920, the circumstances under which it was issued and the creation of the North American metropolitan district in reliance thereon, in view of the strong probability that the Patriarchate, though nominally re-established, cannot function except as an arm or agent of an antireligious civil government, in view of what appears to be the overwhelming adherence of the faithful in America to the clergy of the metropolitan district rather than to the new diocese organized by Benjamin; in view of all this, it is incumbent upon the courts of this State to move cautiously and carefully in this difficult field, to gather all the evidence possible, to entertain the views of expert church scholars, to analyze the available documents and the canon law, to make findings of fact and to exercise sound discretion thereon, building up a record which is suitable for intelligent review and adjudication by the appellate courts.

The action of the court, based upon appearances rather than facts which were then difficult to ascertain, and based upon a conventional legal formula uncritically accepted without reappraisal in the light of special circumstances, resulted in a judgment in 1926 which led to the occupancy of the cathedral

for over twenty years by persons who had no right to be there, *a fact which is now conceded by both parties.* It would be most unfortunate if this court, with so graphic a warning at hand, permitted such a mistake to occur again.

Moreover, since the public policy of the State of New York with respect to this controversy was so strongly pronounced in 1945 and 1948, there is some obligation, we think, upon the courts of this State to attempt, if at all possible within the framework of legal rules, statutes and the Constitution, to finally adjudicate in our State courts the questions posed by this litigation so that we may determine them under State decisional law as the United States Supreme Court hoped could be done when it ordered reargument and which it was prevented from doing because of our " unequivocal remittitur " which had been amended at the request of the defendants so as to enable them to test out in the Supreme Court the constitutionality of our State statute as distinguished from our State decisional law (302 N. Y. 689).

In this connection, as bearing upon our settled public policy in passing the legislation of 1945 and 1948, and as confirmation of the interpretation which the majority of this court placed upon such legislation, we note the letter of Governor Thomas E. Dewey, dated December 22, 1950, to Archbishop Leonty of the North American metropolitan district, which appears in plaintiff's brief in the Supreme Court of the United States but which was not submitted to us on the appeal here. In that letter, Governor Dewey stated:

" I have your gracious telegram conveying greetings from the Eighth All American Sobor of Russian Orthodox Greek Catholic Church of North America. I was happy to be able to sign the Acts of the New York State Legislature in 1945 and 1948 which confirmed the members of the Russian Orthodox Greek Catholic Church in the possession of Saint Nicholas Cathedral in New York City, thus freeing it from the evil and sacrilegious influence of representatives of the Soviet.

" I join you in looking forward to the time when all worshippers of the Orthodox Greek Church in the world will be free from the clutches of the Soviet Government.

Sincerely yours,

THOMAS E. DEWEY "

The motion to amend the remittitur should be granted to the extent that a new trial is ordered and the case should be remitted to the Supreme Court, New York County, for trial in accordance with the opinion herein.

DESMOND, J. (dissenting). We dissent. Our authority is the clear, positive and binding pronouncement, by the United States Supreme Court, in its opinion in this very case, of the law of this identical controversy (*Kedroff* v. *St. Nicholas Cathedral,* 344 U. S. 94). The sole question in the litigation was, and is, this: May intervening defendant Fedchenkoff, holder of an admittedly valid appointment by the Patriarch of Moscow, world head of the Russian Orthodox Church, as archbishop of the North American Diocese, be prevented by the State of New York from occupying as his see church the archdiocesan cathedral in New York City? This court, when the case was here before (*St. Nicholas Cathedral* v. *Kedroff,* 302 N. Y. 1) barred the archbishop from the cathedral, and decreed possession thereof to the Russian church in America, a separatist movement. This court's reliance for that holding was on article 5-C of the New York Religious Corporations Law, judicially construed as transferring the cathedral from control by the mother church in Russia, to control by the " American Church ", on a supposed legislative determination that the Moscow Patriarchate was a mere instrumentality of the Communist regime in the U. S. S. R., and so incapable of carrying out the religious trust. But the United States Supreme Court, reaffirming *Watson* v. *Jones* (13 Wall. [U. S.] 679) held flatly that the *Watson* rule gave constitutional protection, under the First Amendment, to the filling of ecclesiastical offices by the appointive power of the church (see *Gonzalez* v. *Archbishop of Manila,* 280 U. S. 1).

The *Watson* v. *Jones* (*supra*) formulation of a fundamental American doctrine of religious freedom (old in New York, see *Connitt* v. *Reformed Prot. Dutch Church of New Prospect,* 54 N. Y. 551) is simply this: that, as to a subordinate body of a general church organization, the civil courts must accept, as finally binding, the decisions of the supreme judicatory of the general organization in all matters of discipline or belief, or ecclesiastical custom or law. Since, said

the Supreme Court in its opinion in our case, the Russian Orthodox Church is hierarchical in government, the power to appoint, and the choice of, its archbishops is a matter of ecclesiastical government, as is the right of that appointee, as such, to occupy the cathedral. Therefore, the question sought to be litigated in this suit was one with which the civil courts had nothing whatever to do. Any State interference with such choice of a prelate, or such occupancy, would be violative of freedom of religion under the Federal Constitution. The Supreme Court, therefore, reversing this court's reversal of the lower New York courts, sent the case back to us for further proceedings '' not in contravention of '' (344 U. S., p. 121) the Supreme Court's opinion. Since the sole purpose of the suit was to obtain an adjudication, contrary to that of the Orthodox Church's highest judicatory, on a pure question of ecclesiastical government and discipline, the only possible consistent course for this court to take, after that reversal, was to order the complaint dismissed. Instead, action most inconsistent is being ordered, in the form of a trial as to the motivations of the Patriarch of Moscow, and as to the qualifications of Archbishop Fedchenkoff. The ordering or holding of such a trial, or any determination therein, either way, on either of the two questions, has been banned in advance, we say, by the Supreme Court, as an unconstitutional intrusion by the State of New York into the inner affairs of a church. Actually, the interference in this, its second form, is more to be condemned than was the first attempt. Our first decision here was based on a New York statute and, perhaps, there was some duty in the New York courts to try to salvage that statute. Yet, now that the statute has been stricken down as unconstitutional, we are licensing a trial in a civil court to find a fact which, if found, could be no basis for any constitutionally valid judgment.

If unconstitutionality under the First Amendment were not so plain here, we would state more fully the impropriety, as a matter of New York practice, of ordering a new trial, on this record. Here, we are told, there are two fact issues to be tried: as to the domination of the Patriarch by the Kremlin, and as to the fitness of his archiepiscopal appointee. But, at the first trial, plaintiff frankly conceded in open court that it could

never hope to prove the " domination " by common-law evidence, and asked, instead, that judicial notice be taken. After this court gave plaintiff judgment on an assumption that the Legislature had acted on knowledge of that supposed fact of patriarchal subjection to the communists, the United States Supreme Court said that, even if such were the fact, State action based thereon could not be valid, in an ecclesiastical matter. So, the trial we are ordering, insofar as it concerns the workings of the Patriarch's mind and the purity of his motives, is unjustified by the record, and, by concession, foreordained to futility. As to any question of the fitness of the intervening defendant for the archbishopric, no such contention was made at the first trial.

Pressed on us now as some sort of authority for this new trial order are *Kedrovsky* v. *Rojdesvensky* (242 N. Y. 547) and *Kedrovsky* v. *Russian Catholic Church* (249 N. Y. 75). If either of those decisions deny the right of the Patriarch of Moscow to appoint the archbishop of New York, then they were overruled on November 24, 1952 (344 U. S. 94, *supra*). The long and short of it is that the order which this court now hands down violates not only the Supreme Court's mandate, and the First Amendment, but long and thoroughly settled New York law (*Jarvis* v. *Hatheway*, 3 Johns. 180 [1808]; *Dieffendorf* v. *Reformed Calvinist Church,* 20 Johns. 12 [1822]; *Dutch Church in Albany* v. *Bradford,* 8 Cow. 457 [1826]; *Connitt* v. *Reformed Prot. Dutch Church of New Prospect,* 54 N. Y. 551 [1874], *supra*). And those old cases of ours were in the direct line of descent from fundamental American thought much older than the Constitution itself (*vide,* Roger Williams in the seventeenth century: " The government of the civill Magistrate extendeth no further than over the bodies and goods of their subjects, not over their soules, and therefore they may not undertake to give Lawes unto the soules and consciences of men " quoted in Rossiter's Seedtime of the Republic [1953], p. 197).

The complaint should be dismissed.

LEWIS, Ch. J., DYE and FROESSEL, JJ., concur with CONWAY, J.; DESMOND, J., dissents in opinion in which FULD, J., concurs; VAN VOORHIS, J., taking no part.

Motion granted, etc. [See 306 N. Y. 572.]