OPINION OF THE COURT
Martin Rodell, J.
“Provide yourself with a Rabbi” (Talmud, Avoth, ch 1, Mishnah 6).
“Despise the Rabbinate” (Talmud, Avoth, ch 1, Mishnah 10).
“Any Rabbi whom the community does not constantly wish to fire is no Rabbi” (Rabbi Israel Lipkin of Salant [1810-1883]).
This mixed ethos is a fact of synagogue or church life, which in effect recognizes that any position of leadership, even a spiritual one, invites a certain degree of inevitable opposition. Professor Aaron M. Schreiber in his comprehensive work on Jewish Law and Decision-Making — A Study Through Time (Temple Univ Press [1979], p 331) historically capsulizes this institutional phenomenon: “In *868 the power tensions between the communal Rabbi and laymen, much depended, of course, upon the personality of the particular Rabbi, the extent of the pressure to which he was subject, and many other factors.”
It would seem that such is the soul and substance of the instant action for declaratory judgment. After trial, the following facts were adduced:
The plaintiffs are members in good standing of the Kissena Jewish Center, which is a religious corporation of the Jewish faith, duly organized and existing pursuant to article 10 of the Religious Corporations Law. Plaintiffs Oscar Zimbler, Leon Kaiser, and Michael Male were also members of the board of trustees of the center when the action was commenced. The defendants are the duly elected officers of the center and members of the board of trustees.
On December 20, 1978 the plaintiffs and other members attended a general membership meeting, at which a motion was made to extend the employment contract of Rabbi Harold Frankel from its terminating date of January 15, 1983 to a new terminating date of January 14, 1989. This resolution was approved by a vote of 41 in favor and 32 opposed, which constituted a majority of the members present and voting at the said meeting.
On January 3, 1979 the board of trustees passed the following resolution on a motion which was carried by a vote of seven in favor and four opposed:
“Whereas the membership voted at a duly convened general meeting of the membership on December 20, 1978 on a motion to extend the Rabbi’s contract for six years which motion conflicts with the constitution established practice of the Kissena Jewish Center ***
“Resolved that the Board of Trustees does declare the motion voted by the membership at a general meeting of the membership on December 20, 1978 to extend the contract of the Rabbi for six years be and is null and void and that none of the officers of the Kissena Jewish Center conclude any agreement extending the Rabbi’s contract as contained in such null and void motion.
*869 “It is the intent of the resolution to reaffirm that all motions involving the expenditure of funds in excess of $500.00 must originate with the Board of Trustees and further, action by any officer of the Kissena Jewish Center contrary to this resolution shall be considered an ultra vires act by such officer and the Kissena Jewish Center may act to recover from such officer any losses sustained by the Kissena Jewish Center because of such ultra vires act.”
The plaintiffs sue in their own behalf and for all other similarly situated to have the board of trustees of the center recognize their voting rights and to act in accordance therewith.
The declaratory judgment sought by the plaintiffs is to: (1) adjudge and declare that the afore-mentioned resolution of the board of trustees, which purports to nullify the majority vote of the general membership meeting of December 20, 1978 to extend the contract of the Rabbi, is illegal and void in that it violates sections 5 and 200 of the Religious Corporations Law; and (2) to direct the president of the Kissena Jewish Center to execute a written contract with Harold Frankel, extending his employment as Rabbi from January 15, 1983 to January 14, 1989, under the same terms, conditions and salary as the existing contract, which terminates January 14, 1983.
The defendants have alleged the following in their defense: (1) that the general membership meeting of December 20, 1978 was not called in accordance with the notice requirements of section 194 of the Religious Corporations Law; (2) that the board of trustees did not approve or make any affirmative recommendations to the membership at the said meeting, and as such, the alleged extension of the Rabbi’s contract was in violation of the constitution and by-laws of the center, and is null and void; and (3) that many of the duties required to be performed by the Rabbi, pursuant to the extended agreement, cannot be performed by reason of the nonexistence of the involved facilities.
Before entertaining the merits of this specific action, the court has carefully pondered whether a controversy of this nature is the proper subject for a secular declaratory judgment. It is well established that under CPLR 3001 a *870 declaratory judgment is a remedial provision, the primary purpose of which is to stabilize legal relations and eliminate uncertainty as to the scope and content of present or prospective obligations. (See Barry v Ready Reference Pub. Co., 25 AD2d 827; 3 Weinstein-Korn-Miller, NY Civ Prac, par 3001.02.) CPLR 3001 also provides that the court “may render” a declaratory judgment, thereby clearly indicating that the jurisdiction to render a declaratory judgment is discretionary in character. The Court of Appeals has said that this discretion must be exercised judicially and with care, and where there is no necessity for resorting to it, it should not be employed. (James v Alderton Dock Yards, 256 NY 298; Chase Nat. Bank of City of N.Y. v Raleigh Estates, 266 App Div 864; 24 Carmody-Wait 2d, NY Prac, § 147:5, p 390.) This court, like other courts across the nation, is reluctant to interfere with the internal affairs of religious groups. (See Tribe, American Constitutional Law, ch 14.) “Causes spiritual must be judged by judges of the spiritual and causes temporal by temporal judges.” (24 Henry VI [YB] 8, ch 12 [1532].) “‘[T]he rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of the governmental hand’ ”. (School Dist. of Abington Twp., Pa. v Schempp, 374 US 203, 231, quoting Rep Daniel Carroll of Maryland during the debate on proposed Bill of Rights in the First Congress.) At the very heart of the First Amendment is the proposition that “[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.” (Watson v Jones, 13 Wall [80 US] 679, 728.) As early as the closing years of the eighteenth century and the first 20-odd years of the New York State Constitution of 1777, principles of religious freedom and separation of church and State were firmly joined to the religious and legal framework of New York life. (Pratt, Religion, Politics and Diversity — The Church-State Theme in New York History [Cornell Univ Press], pp 108-109.) These principles were expressed by Chief Justice John Jay, who believed that religious rights “are, by nature, subject to no control but that of the Deity ***. No opinions are dictated; no rules of faith prescribed; no preference given to one sect to the prejudice of others.” (Jay, The Charge of Chief Justice Jay to the Grand *871 Inquest of the County of Ulster, on the Ninth Day of September, 1777, Kingston, N.Y., 1777, pp 9-10.)
Thus, American courts both State and Federal have uniformly held that “in matters purely religious or ecclesiastical, the civil courts have no jurisdiction.” (Watson v Garvin, 54 Mo 353, 378.) The Supreme Court described the First Amendment as resting “upon the premise that both religion and government can best work to achieve their lofty aims if each is left free of the other within its respective sphere” (Illinois ex rel. McCollum v Board of Educ., 333 US 203, 212), and the First Amendment was intended to prevent “a union of government and religion [that] tends to destroy government and to degrade religion” (Engel v Vitale, 370 US 421, 431).
Tribe summarizes the three distinct schools of thought which influenced the drafters of the Bill of Rights (American Constitutional Law, ch 14, p 816): (1) the evangelical view espoused by Roger Williams that “‘worldy corruptions *** might consume the churches if sturdy fences against the wilderness were not maintained’”; (2) the Jeffersonian view that the church should be walled off from the State in order to safeguard secular interests “ ‘against ecclesiastical depredations and incursions’”; and (3) the Madisonian view that religious and secular interests alike would be advanced best by diffusing and decentralizing power so as to insure competition among sects rather than dominance by anyone.
This court weighed heavily the argument that a court drawn into an internal religious dispute will surely become “entangled” in church affairs. (Tribe, id., pp 865-880; see, also, an excellent recent article on this same matter: Ell-man, Driven from the Tribunal: Judicial Resolution of Internal Church Disputes, 69 Cal L Rev 1378-1444.)
Upon initial examination it seemed that judicial authority was being sought on a religious matter in which the State has no apparent secular interest. Admittedly, this court was tempted to summarily dispose of the instant action in the same fashion as Matter of Anthony v Cardin (91 Misc 2d 506, 507), where the court ruled: “The application, insofar, as it seeks to direct respondent to elect a *872 rector, is denied. This is a matter in which the temporal courts are required to keep hands off (Religious Corporations Law, § 25, Rector, Churchwardens & Vestrymen of Church of Holy Trinity v Melish, 3 NY2d 476, 483).”
Furthermore, to complicate matters, this court differs with the conclusion of a previous court ruling, Kupperman v Congregation Nusach Sfard of The Bronx (39 Misc 2d 107), which distinguishes a Rabbi from the Baptist Ministry, relegating the calling of a Rabbi to the category of the “mundane” and “temporal”, which would invite judicial intervention, unlike the pastoral relationship of a Baptist congregation, which “is an ecclesiastical matter with which the courts shall not interfere”. (Kupperman v Congregation Nusach Sfard of The Bronx, supra, p 112.) It was precisely this kind of substantive “governmental evaluation” of religious practices, and the entanglement of “government in difficult classifications of what is or is not religious” which has been categorized by the United States Supreme Court as “excessive government entanglement with religion” that truly threatens private liberty and public order alike. (Walz v Tax Comm. of City of N. Y., 397 US 664, 674; Tribe, American Constitutional Law, p 869.) The Kupperman decision dared to evaluate “the nature of the structure of this religious faith” (Kupperman v Congregation Nusach Sfard of The Bronx, supra, p 113), and brings to mind James Madison’s brilliant Memorial and Remonstrance Against Religious Assessments, wherein he labeled the suggestion that “the Civil Magistrate is a competent Judge of Religious truth” as an “arrogant pretension falsified by the contradictory opinion of Rulers in all ages, and throughout the world.” (II The Writings of James Madison [G. Hunt ed, 1901], pp 183-191.)
Not to become further entangled in the theological thicket, but simply to set the record straight, this court will briefly comment on the relevant question raised in the Kupperman decision as to whether the tenure of a Rabbi involves questions of discipline and doctrine or is merely a temporal matter. The Kupperman decision came to its conclusion as follows:
“In the similar but distinguishable Walker Mem. Baptist Church v. Saunders (285 N. Y. 462) although the Baptist *873 Church, similar to the case at bar, did not have a ‘central governing body’, nevertheless the congregation in the Walker case ‘had subscribed to Hiscox’ codification of the principles, policies, customs and usages of the Baptist Church’ thereby rendering that congregation subject to such ecclesiastical restrictions in the calling and discharge of its pastor.
“No such subscription to regulations bearing on the appointment or discharge of a Rabbi is found in the case at bar. Parenthetically, it is pertinent to observe that according to basic Jewish practices, only a quorum of 10 men (minyon) is needed to conduct services and the presence of the clergy is neither required nor prohibited. Neither the contract of employment between the parties nor the constitution and by-laws of the defendant make any reference to a higher or superior ecclesiastical authority. The contract, which formalized the prior existing relationship between the parties, aside from setting forth the salary to be paid, contained provisions regarding notice of renewal or cancellation at the option of the parties and restrictive covenants effective at the termination of the contract — all of which cast that document in the category of a mundane contract of employment rather than a spiritual call concluded through or with a governing ecclesiastical body. * * *
“The court is constrained to conclude that the defendant is empowered as an autonomous congregation to call, settle, dismiss or remove its clergy, and therefore, because of the nature of the structure of this religious faith, the appointment and tenure of this ordained spiritual leader does not involve questions of discipline and doctrine but is a temporal matter about which the court may inquire and consider in the light of the civil contractual rights and obligations of the parties.” (Kupperman v Congregation Nusach Sfard of The Bronx, supra, pp 112-113.)
In order to better understand the role of a Rabbi as a religious leader who fulfills a spiritual calling and can only be relegated to the category of a “mundane” employee by those ignorant of his role, one should read Schreiber’s historical description of the Rabbi throughout the ages (Schreiber, Jewish Law and Decision-Making — A Study Through Time, Temple Univ Press [1979], pp 320-335). *874 “The Rabbi’s power stemmed from the universal reverence for learning among Jews, and the accepted principle, and ancient tradition, that the scholar-religious leader should be the head of the community.” (Schreiber, id., p 321.) Rabbi, Dr. Bernard Rosenzweig adds another perspective in The Emergence of the Professional Rabbi in Ashkenazic Jewry (Tradition, Fall, 1970, pp 26-27): “The Rabbi was not only the scholar who headed the Yeshiva, but he was also the judge who served the community as the Av Bet Din. In this capacity he fulfilled an important function in the Jewish community. He insured that Jewish internal self-government, which was based on the right of Jews to be judged by their own courts, would not be undermined or thrwarted [sic] * * *. All the communal functionaries and all the religious functions were under his direct jurisdiction.”
In contrast to the unfounded conclusion in the Kupperman decision, that the calling of a Rabbi does not involve questions of doctrine and discipline but is a temporal matter, is the erudite presentation of Rabbi, Dr. J. David Bleich on the subject of rabbinic tenure, which highlights the following points (Tradition, vol 14, No. 4, Fall, 1974, p 129):
“Traditionally * * * synagogal functionaries enjoy tenure in their positions as long as they are not remiss in the performance of their duties. This arrangement serves to protect the livelihoods of persons whose talents and specialized skills have been devoted to public service. Thus it precludes the ignominious possibility that an individual who has sacrificially devoted years of service to the community may be discharged due to frivolous whim or personal animosity. But, most significantly, tenure serves to preserve the independence and integrity of religious leadership much in the same manner that academic tenure serves as the single most potent safeguard of academic freedom.
“Tenure in Rabbinic office is a well-established provision of Jewish law and references to this prerogative may be found in many diverse sources.”
The Responsa Rivash, No. 271 (R. Isaac b. Sheshet Perfet [1326-1408]), finds the Halakhic (Jewish law) concept of *875 tenure to be based upon the statement of the Palestinian Talmud (Horiyot 3:5) to the effect that care was exercised in taking apart and reassembling the Tabernacle to assure that boards used for the different walls on the various sides of the courtyard not be interchanged. Even an inanimate piece of wood, once it has been accorded the “privilege” of occupying a position of honor cannot be removed and assigned an inferior position. Other authorities cite the Talmudic principle “In matters of sanctity one enhances but does not diminish”, and interpret it as prohibiting the diminution of “sacred” responsibility by removal from office.
The Chikrei Lev, Orach Chaim, No. 50 (R. Joseph Raphael b. Chayyim Joseph. Chazzan [1741-1820]) regards rabbinic tenure as a divinely bestowed prerogative which cannot be waived by a term or option clause. (See Levine, Free Enterprise and Jewish Law [1980], p 53.) Accordingly, any contractual agreement to this effect constitutes a stipulation contrary “to that which is written in the Torah” and hence ipso facto is null and void. The Chatam Sofer, No. 206 (R. Moshe Sofer [1762-1839]) has emphatically ruled: The congregation “cannot withdraw from the agreement even after the stipulated period has expired unless there is a custom to this effect *** but it has never been heard or seen in these lands that a rabbi has been removed and deposed from his rabbinical chair and such dare not be done.” As Bleich has observed (Tradition, vol 11, No. 3, Fall, 1970, Rabbinic Contracts, p 72): “Indeed, on the basis of the Chatam Sofer’s declared opinion, it might be argued that such tenure accompanies every rabbinic appointment.” (See Igrot Moshe, Choshen Mishpat I, Nos. 76, 77, Rabbi Moshe Feinstein; see, also, vol VIII of the published decisions of the Israeli Rabbinical Courts, pp 129-162; Prof. Solomon Zeitlin, The Opposition to the Spiritual Leaders Appointed by the Government, Jewish Quarterly Review, vol 31, pp 287, 290.)
As a final footnote to the religious nature of rabbinic tenure, Bleich cites a recent attempt by officials of the Jewish community of Rotterdam to terminate the tenure of their Rabbi by refusing to renew his contract. In separate declarations, the Israeli Chief Rabbinate, the Union of *876 Orthodox Rabbis of the United States and Canada and the Dutch Board of Chief Rabbis affirmed the principle of rabbinic tenure and indicated that any dispute between a community and its spiritual leader must be submitted to a qualified Bet Din (Rabbinic Tribunal), since only a Bet Din is competent to render a decision with regard to grounds for termination of rabbinic tenure. (Bleich, Tradition, vol 14, No. 4, p 133.)
As has been presented herein, the Kupperman decision simply misstated “the nature of the structure of this religious faith”, and de minimus, the appointment and tenure of an ordained spiritual leader of the Jewish faith certainly involves questions of discipline and doctrine, and is not merely a temporal matter. The Kupperman court would have been better advised in adhering to the admonition of the United States Supreme Court in Fowler v Rhode Island (345 US 67, 70): “it is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment. * * * To call the words which one minister speaks to his congregation a sermon, immune from regulation, and the words of another minister an address, subject to regulation, is merely an indirect way of preferring one religion over another.”
In the same fashion, to call the pastoral relationship of one congregation an ecclesiastical matter, with which the courts shall not interfere, and the clerical relationship of another congregation as temporal and mundane, inviting judicial interference, is to prefer one religion over another, and more than just entangle, in effect, it would trample upon the very foundations of the First Amendment.
If the instant matter before the court involved only governmental authority versus religious automony, this court would have found no difficulty in refusing to pronounce a declaratory judgment, and would have respectfully declined jurisdiction. But this is hardly a situation where a meddlesome government is gratuitously inserting itself into church affairs. In fact, the court, having suggested many times that a religious tribunal would be a more appropriate forum, is confronted with the adamant request of both factions of a synagogue to have the court *877 resolve their dispute. There is no question that the dispute involves rights ordinarily recognized under corporation and contract law. Complete autonomy for the organization — total immunity from judicial dispute resolution — would thus require denying church members ordinarily available judicial remedies, solely because of the religious nature of the organization in which the contractual or corporate dispute arose. As Professor Ellman (Driven from the Tribunal: Judicial Resolution of Internal Church Disputes, 69 Cal L Rev 1378, 1383) observes: “When a court refuses to adjudicate church disputes, it may sacrifice members’ contractual interests and religious freedom. Immunity from judicial dispute resolution may also burden the organizational efforts of religious groups by denying them the benefit of secular rules that facilitate the creation and growth of private, voluntary associations. There is thus a tension between automony for the church and some of the very values that such autonomy might at first be assumed to further. This tension colors the constitutional question differently than appears on initial examination.”
Recent United States Supreme Court decisions have addressed this jurisdictional dilemma, and before this court applies these principles to the instant matter, it is important to stress other United States Supreme Court pronouncements, which, if followed, might prevent future questions of unnecessary entanglement:
“The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. * * * It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.” (Watson v Jones, 13 Wall [80 US] 679, 728-729, supra.)
“[T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules *878 and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.” (Serbian Eastern Orthodox Diocese v Milivojevich, 426 US 696, 724-725; see, also, Kedroff v St. Nicholas Cathedral, 344 US 94, 107-110.)
Every religious organization is to be encouraged to establish or adopt its own religion’s internal decision-making organs, which would invite judicial deference and avoid judicial difference. (See, e.g., Goldstein, Jewish Justice and Conciliation, History of the Jewish Conciliation Board of America, 1930-1968, And a Review of Jewish Juridical Autonomy [New York, 1981]; see, also, NYLJ, Nov. 27, 1981, p 2, cols 3-6.)
This court has weighed heavily whether to decline jurisdiction and to avoid adjudication in this matter, a choice which would certainly meet the goal of avoiding “entanglement”. However, Ellman suggests that this choice, while sometimes necessary, can and should be avoided in the majority of cases in which a religiously neutral adjudication is possible. “[T]he goal is a religiously neutral adjudication: one that neither advances nor retards a church faction on the basis of its religious views” (Ellman, Driven from the Tribunal: Judicial Resolution of Internal Church Disputes, 69 Cal L Rev 1378, 1383), and which imposes no governmentally developed religious, doctrinal, or organizational preferences on the disputants. In fact, a recent United States Supreme Court decision (Jones v Wolf, 443 US 595) indorses the “neutral principles of law” approach which entails settling disputes on the basis of the language of deeds, contracts, the terms of the local church charters, the State statutes, and the provisions in the constitution of the general church.
“The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. * * *
*879 “The neutral-principles method * * * requires a civil court to examine certain religious documents, such as a church constitution * * *. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts ***.
“The neutral-principles approach cannot be said to ‘inhibit’ the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods.” (Jones v Wolf, 443 US 595, 603-606, supra.)
The Jones court reiterates the solution to nonentanglement as first set down in Presbyterian Church v Mary Elizabeth Blue Hull Church (393 US 440, 449) by recognizing the obligation of “ ‘States, religious organizations, and individuals [to] structure relationships *** so as not to require the civil courts to resolve ecclesiastical questions.’” (Jones v Wolf, supra, p 604.)
It is in this vein that although this court has established that the calling and tenure of a Rabbi is a spiritual matter, nevertheless, religiously neutral adjudication is possible, given the circumstances of this case. Upon a full trial of this action, the court has, in accordance with Jones v Wolf (supra), carefully scrutinized inter alia the following documents in purely secular terms: Rabbi Frankel’s original contract; the supplemental agreements dated October 11, 1970 and May 1,1973, respectively; the constitution of the Kissena Jewish Center; and the minutes of the relevant membership and board meetings, which were introduced into evidence. Furthermore, the court has applied the appropriate State statutes governing this case, especially the Religious Corporations Law and the decisional law thereon, to arrive at the following determination on the basis of religiously neutral principles of law, and has not in any way relied upon religious precepts, nor has this court inquired into any religious doctrine.
It is undisputed that at a general membership meeting of the Kissena Jewish Center on November 15, 1978, by a vote of 38 to 3, it was agreed to place the question of the extension of the Rabbi’s contract on the agenda for the *880 membership meeting of December 20, 1978. In addition, there is no dispute that the following mailed notice of the December 20, 1978 meeting, introduced into evidence, was given to the membership:
. “This is to inform you of our next General Membership Meeting which is to be held on December 20, 1978 at 8:30 P.M.
“Please attend this meeting as we shall have on the agenda the extension of the existing contract of our Rabbi, which is due to terminate on January 1983 and he is requesting an extension of six years which is to terminate January 1989. At the meeting we will consider and vote upon such an extension. There will be many opinions on the above matter so I urge you to be present at the meeting.”
The letter was signed by the defendant Abraham Spiegel, as president.
It is the opinion of this court that the above written notice complied with section 1 of article XV of the center’s constitution, which provides: “The Rabbi shall be elected by a majority of the votes cast at a membership meeting of the Center. Written notice of the proposed election shall be sent to all members in advance of the date set for the election meeting.”
Based upon the preponderance of the evidence, this court further finds that two prior public announcements were made by the Rabbi at the morning religious services on the two consecutive Saturdays, namely, December 9,1978 and December 16, 1978, advising the membership of the meeting and the agenda, in full compliance with section 194 of the Religious Corporations Law. In fact, the resolution by the board of trustees on January 3, 1979 explicitly stated that: “the membership voted at a duly convened general meeting of the membership on December 20, 1978.” (Emphasis supplied.) Accordingly, it is the opinion of this court that proper notice of the December 20, 1978 meeting was given.
The defendants in their resolution of January 3, 1979 have asserted that the membership vote of December 20, 1978, which approved the motion to extend the Rabbi’s *881 employment contract was “null and void”, because such a motion must originate with the board of trustees, pursuant to section 4 of article XIII of the synagogue’s constitution, which reads: “The Board of Trustees shall have the power to conclude all contracts not exceeding five hundred dollars. Contracts in excess of this amount must be approved by the Center at a regular or special membership meeting.”
This assertion, in the opinion of this court, is unfounded as a matter of law. On the contrary, the board of trustees of a synagogue is expressly prohibited by statute from exercising any power with respect to the tenure of the Rabbi. Section 5 of article 2 of the Religious Corporations Law provides, in part, as follows: “But this section does not give to the trustees of an incorporated church, any control over the calling, settlement, dismissal or removal of its minister, or the fixing of his salary”.
Section 200 of article 10 of the Religious Corporations Law, specifically applicable to synagogues, reiterates this provision as follows: “A corporate meeting of an incorporated church, whose trustees are elective as such, may give directions, not inconsistent with law, as to the manner in which any of the temporal affairs of the church shall be administered by the trustees thereof; and such directions shall be followed by the trustees. The trustees of an incorporated church to which this article is applicable, shall have no power to settle or remove or fix the salary of the minister”.
As the court said in Hayes v Board of Trustees of Holy Trinity Baptist Church of Amityville (225 NYS2d 316, 320): “The office of pastor of a congregation is one of dignity, reverence and esteem. Its import to the members of the congregation is of the greatest significance. It is one in which the entire congregation shares interest and one in the continuation of which, the entire congregation is entitled to a voice.” (Also, see, Beulah Wesleyan Methodist Church v Henry, 62 NYS2d 297, 300.)
If anything, this court finds the afore-mentioned section 1 of article XV of the synagogue’s constitution more appropriate to the instant matter: “The Rabbi shall be elected by *882 a majority of the votes cast at a membership meeting of the Center”.
Nowhere in article XV of the synagogue’s constitution, which deals specifically with the Rabbi, is there any mention of the power of the board of trustees to settle, remove, or fix the salary of the Rabbi, as such is reserved by law to a majority of the votes cast at a membership meeting of the center. There is no reason for this court to interpret the synagogue’s constitution as being contrary to law. Accordingly, this court adjudges and declares that the January 3, 1979 resolution of the board of trustees of the Kissena Jewish Center, which purports to nullify a vote of the majority of the membership at a general membership meeting of December 20, 1978 to extend the contract of Rabbi Harold Frankel for an additional six years from January 15,1983 to January 14,1989, is illegal and void in that it contravenes sections 5 and 200 of the Religious Corporations Law, and article XV of the synagogue’s constitution.
Finally, the defendants argued that since paragraph 3 of the Rabbi’s original contract provided that his duties included supervision of the Religious School, and such Religious School was discontinued in 1976, that the aforesaid contract could not be extended by the membership. This argument is without merit. Such an extension agreement has been in effect commencing January 15, 1977 to January 14,1983, and despite the fact that the Religious School remained closed, the board of trustees has honored the terms of the said agreement. Furthermore, it is undisputed that the facilities for the Religious School presently exist and that the Rabbi is available for the supervision of the school. It further appears that it was the action of the trustees which resulted in the discontinuance of the Religious School. The defendants cannot, therefore, rely on their own failure to operate the Religious School to prevent the extension of the contract. As the court stated in Kooleraire Serv. & Installation Corp. v Board of Educ. (28 NY2d 101, 106): “The general rule is, as it has been frequently stated, that a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition. In *883 Stern v. Gepo Realty Corp. (289 N. Y. 274, 277) it was observed ‘one may not take advantage of a condition precedent, the performance of which he himself has rendered impossible.’ ”
There is no question that if and when the Religious School is reopened, the contract, as voted by the membership, will obligate the Rabbi to continue his role as supervisor of the school. There appears to be no impediment to prevent the Rabbi from performing his other educational duties, pursuant to paragraph 3, which states that he “shall supervise all other educational endeavors of the congregation.”
For all of the above reasons, the defendants have a legal obligation to recognize and act in accordance with the resolution of the general membership, as voted by a majority present and voting at the meeting of December 20, 1978. Accordingly, the defendant Herman Felber, president of the Kissena Jewish Center, is directed to execute a written contract with Harold Frankel, extending his employment as Rabbi from January 15, 1983 to January 14, 1989, under the same terms, conditions, and salary as the existing contract between the Kissena Jewish Center and Harold Frankel, which terminates on January 14, 1983.
Were it in the province of this court, the final paragraph of the original contract would also be invoked in its original form: “May the Almighty bless and prosper the joint efforts of both the Rabbi and Congregation.”