244 N.J. Super. 119 (1990)
581 A.2d 900
BENJAMIN ALICEA, PLAINTIFF-APPELLANT,
v.
NEW BRUNSWICK THEOLOGICAL SEMINARY, DEFENDANT-RESPONDENT, AND ROBERT A. WHITE, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 2, 1990.
Decided October 24, 1990.
*121 Before Judges PRESSLER, BAIME and ARNOLD M. STEIN.
Thomas W. Sweet argued the cause for appellant (Sweet & Connelly, attorneys; Thomas W. Sweet of counsel; Thomas W. Sweet and Alan G. Hempel on the brief).
Aron M. Schwartz argued the cause for respondent (Vogel, Chait, Schwartz & Collins, attorneys; Aron M. Schwartz of counsel; Aron M. Schwartz and Marc E. Alterman on the brief).
The American Civil Liberties Union submitted an amicus curiae brief (Ronald K. Chen, Rutgers Law School, counsel of record; Eric Neisser and Elizabeth Miller, American Civil Liberties Union, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
*122 This appeal presents difficult questions concerning the jurisdiction of a civil court over an employment contract dispute between a theological seminary and a faculty member. Plaintiff, an ordained minister, instituted this action in the Law Division, alleging that the New Brunswick Theological Seminary (NTS), an educational institution affiliated with the Reformed Church in America, improperly denied him tenure contrary to an agreement between him and its former president. The Law Division granted summary judgment in favor of NTS primarily on the basis that the dispute implicated church doctrine and practice not subject to the authority of the secular courts. We affirm the judgment but for reasons somewhat different than those expressed by the Law Division. We hold that the tension between the Church's ecclesiastical interests and plaintiff's contract rights can best be alleviated by requiring submission of the dispute to NTS's established grievance process.

I.
The salient facts are not in dispute. We begin by describing the interrelationship between the Church and NTS and their organizational structure.
The Reformed Church of America, formerly the Reformed Protestant Dutch Church in North America, is a religious institution committed to "minister[ing] to the total life of all people by preaching, teaching and proclaim[ing] the gospel of Jesus Christ." The Church is a hierarchical ecclesiastical body. The highest assembly and judicatory of the Church is the General Synod. The Book of Church Order, the Church's constitution, provides that the General Synod is to "exercise a general superintendence" over the interests of the Church and is to have "original authority over all matters relating to the theological seminaries ..., the appointment and installation of their professors, and the regulation of the courses of instruction." *123 The General Synod exercises its supervision over the theological seminaries through a seminary board whose members it elects. The Book of Church Order states that the Board of Theological Education (BTE) is to supervise the activities of the Church's theological seminaries.
NTS was founded by the Church in 1784. Although its mission was and continues to be "to prepare men and women for educated and faithful leadership in the church ... and ... in specialized ministries," it also offers combined degree programs with other institutions affording theological study with ancillary disciplines. However, NTS itself offers no secular degrees or courses of study. Every president of NTS has been an ordained minister of the Church. All full time faculty members and administrators are ordained ministers. In recent years, NTS has attracted a substantial number of students from other Christian denominations. Because of this diversity, some faculty and administrators who are ordained clergy in other Christian churches have been appointed. However, these individuals have been required to subscribe to the Church's Declaration for Professors of Theology, affirm the doctrinal standards of the Church and accept the authority of NTS's governing body. In short, NTS is an institution of the Church and is wholly accountable to it.
NTS is a non-profit corporation organized under Title 15 (N.J.S.A. 15:2-1a and b, repealed by L. 1983, c. 127, replaced by § 15A:16-2, eff. Oct. 1, 1983). According to the BTE's bylaws, the General Synod is the sole member of the corporation and the BTE is its supervising authority. The members of the BTE are designated as NTS trustees and must be either ministers or laypersons of the Church. NTS's president serves as an ex-officio member of the BTE. The BTE exercises its powers through various standing committees. The BTE's Executive Committee may make interim faculty appointments not to exceed one full academic year. However, according to the BTE's bylaws, only the BTE is authorized to grant full time faculty appointments for a term exceeding one year. So too, the BTE is solely *124 authorized to make administrative and faculty promotions. The BTE's Academic Affairs Committee is responsible for recommending appointments, promotions and grants of tenure.
NTS's policies concerning appointments, promotions, tenure, sabbatical leaves, terminations and grievances are set forth in a comprehensive faculty personnel manual. The manual provides that faculty appointments in the "tenure track" are normally made for three-year terms. In the second year of a second consecutive three-year appointment, the faculty member is to be considered for tenure after a "thorough[] evaluat[ion]." Although the manual is silent with respect to which Church or NTS body is to render tenure decisions, the BTE's bylaws provide that the Academic Affairs Committee is to "recommend to the Board appropriate action with regard to request[s] for tenure of faculty members as submitted by the chief administrative officers of the [s]eminaries." By implication, the bylaws suggest that the BTE is to make all decisions with respect to tenure. The manual provides an optional faculty grievance process. Once internal efforts at reconciliation have been attempted and have failed, "[f]aculty grievances ... may be appealed to the [BTE] through its Student and Faculty Concerns Committee."
Plaintiff commenced his employment with NTS in 1978. After serving approximately two years, plaintiff was appointed Director of Urban Studies for a three-year term from July 1, 1980 to June 30, 1983. The urban studies program offered evening theological courses. The program was jointly offered by NTS and the New York Theological Seminary.
It is undisputed that the then president Rev. Howard Hageman appointed plaintiff to serve as an assistant professor for the 1983-84 academic year. However, the exact nature of that appointment, whether it was temporary or "tenure track," is hotly contested. There is no BTE memorialization of this appointment on record. NTS thus contends that the one-year assignment was a temporary non-tenure track appointment *125 which did not require BTE ratification. In other words, NTS claims that President Hageman merely exercised his prerogative to make non-tenure track faculty appointments for one year or less.
Plaintiff asserts that his appointment was part of a larger agreement between him and President Hageman under which he was to be placed in the "tenure track." In his affidavit, plaintiff contended that in late 1983 he received an offer of employment as a full time professor from the San Francisco Theological Seminary. At approximately the same time, the New York Theological Seminary, which, as we have mentioned, had previously been affiliated with NTS, severed its relationship, leaving NTS with an extremely diminished evening program. Also at this time, a NTS professor in the same field as plaintiff submitted his resignation. According to plaintiff, President Hageman asked him to decline the offer of the San Francisco Theological Seminary. Plaintiff was assured by President Hageman that he would be given a "tenure track" appointment if he accepted the one-year assignment, and that he would be granted tenure upon completion of his doctorate.
Plaintiff accepted President Hageman's offer and the one-year appointment as a member of NTS's faculty. During the 1983-84 academic year, plaintiff taught a course in church history and was also appointed Assistant Director of the newly formed Urban Theological Education program.
As we mentioned previously, the BTE's minutes are totally devoid of any reference to plaintiff's appointment. However, the BTE's January 23, 1984 Management Committee report refers to "negotiations" between plaintiff and Academic Dean Hugh Koope regarding the position "offered" to him. The report indicates that plaintiff was to accept a "position," but it does not expound on the nature or duration of the prospective appointment.
However, former President Hageman's affidavit and deposition testimony substantially corroborate plaintiff's account. *126 According to Hageman, it was his intention to establish two "tenure track" faculty positions, one in modern American church history and the other in early church history to the reformation. Plaintiff was to fill one of the two positions. However, Hageman conceded that plaintiff's appointment was never submitted to the BTE for ratification. Hageman was equivocal with respect to the reason for this omission, at one point claiming that it was a mere "administrative oversight" and at another asserting that the "dual professorship" concept was intended to be "experiment[al]."
In any event, plaintiff contends that he continued his employment at NTS, believing that he would be granted tenure upon completion of his doctoral thesis. However, plaintiff's status at NTS began to deteriorate when in early 1985 Rev. Robert White became president. We need not recount the details of the acrimonious meetings between the two. Suffice it to say that White was chagrined by what he perceived to be plaintiff's lack of commitment to the objectives of NTS. White eventually asked the newly appointed Academic Dean to determine plaintiff's employment status. Finding no BTE ratification of plaintiff's appointment, President White contacted Hageman who confirmed that plaintiff was to be granted tenure upon completion of his dissertation. NTS nevertheless adopted the position that, absent BTE approval, plaintiff was not on a "tenure track."
Ultimately, plaintiff retained an attorney and requested the commencement of the BTE grievance process described in the personnel manual. Negotiations ensued in which President White offered to recommend to the BTE that plaintiff receive a three-year faculty appointment which was to "constitute the final appointment in the tenure-track process." Plaintiff rejected this proposal on the basis that under his agreement with Hageman he had been promised tenure once his doctoral thesis was complete.
*127 President White then suggested that the dispute be submitted to the BTE's Executive Committee. Plaintiff declined this offer, apparently because NTS's personnel manual directed that grievances be presented to the Student and Faculty Concerns Committee. On October 31, 1986, plaintiff resigned. This action was instituted shortly thereafter.
In granting NTS's motion for summary judgment, the Law Division declined to exercise jurisdiction over what it characterized as a religious, doctrinal dispute. Alternatively, the judge determined that plaintiff's agreement with former President Hageman was unenforceable because it was not ratified by the BTE. The judge also found that plaintiff's suit was premature because he had not exhausted all potential administrative remedies in the Church. As a final basis for granting summary judgment, the judge concluded that plaintiff's resignation constituted a bar to this suit.
On appeal, plaintiff contends that former President Hageman had apparent authority to offer him a tenured position. In support of this argument, plaintiff asserts that Church custom and usage over the years dispensed with the formal requirement of BTE ratification. He further claims that he was constructively discharged and that his resignation was made under duress. It is asserted that resort to internal Church remedies would be futile and that the only mechanism for vindication of plaintiff's contract rights is the civil courts. Plaintiff argues that his dispute with the Church does not pertain to a matter of religious doctrine. He contends that the Law Division should have exercised jurisdiction over the controversy and should have resolved his contract claim by applying "neutral principles of law."

II.
At the outset, we recognize that this case is devoid of questions relating to spiritual matters or church doctrine. The dispute before us is not "doctrinal" in nature, even though it *128 arose as a result of a controversy over church practice. Were it not for NTS's affiliation with the Church, we would simply apply well recognized principles of contract and agency law. In that context, we observe that the facts here are strikingly similar to those present in Shebar v. Sanyo Business Systems Corp, 111 N.J. 276, 544 A.2d 377 (1988). Taking plaintiff's allegations as true, he agreed to relinquish a possible new position at the San Francisco Theological Seminary for job security at NTS. In turn, NTS promised to grant plaintiff tenure in exchange for the retention of what it then considered a valued employee. "Such bargained for and exchanged promises furnish ample consideration for an enforceable contract." Id. at 289, 544 A.2d 377.
What gives us pause, however, is the fact that under the Church's allocation of governmental powers as evidenced by the Book of Church Order and the BTE's bylaws, former President Hageman did not have actual authority to unilaterally offer plaintiff a tenured position. Our review of the Book of Church Order and the BTE's bylaws discloses beyond a hint of a doubt that a tenured appointment cannot be granted without BTE ratification.
The question remains, however, whether former President Hageman had apparent authority to offer plaintiff a tenure track position. In a different context, it has been said that "[u]nder our law, a single director or officer, including the president, ... has no authority to bind his corporation." Abeles v. Adams Engineering Co., Inc., 64 N.J. Super. 167, 189, 165 A.2d 555 (App.Div. 1960), certif. granted, 34 N.J. 327, 168 A.2d 692 (1961), judgment modified, 35 N.J. 411, 173 A.2d 246 (1961). However, it is equally well settled that a "principal is bound by the acts of the agent within the apparent authority which he knowingly permits the agent to assume or which he holds the agent out to the public as possessing." Wilzig v. Sisselman, 209 N.J. Super. 25, 35, 506 A.2d 1238 (App.Div. 1986), (quoting Mesce v. Automobile Association of New Jersey, *129 8 N.J. Super. 130, 135, 73 A.2d 586 (App.Div. 1950), certif. den., 104 N.J. 417, 517 A.2d 415 (1986), certif. den., 107 N.J. 109, 526 A.2d 181 (1987)), certif. den. sub nom. Sisselman v. Goldfinger, 107 N.J. 109, 526 A.2d 181 (1987). In deciding issues of apparent authority, "[t]he factual question is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business uses, ... is justified in presuming that such agent has the authority to perform the particular act in question." Ibid. Apparent authority imposes liability, not as a result of an actual contractual relationship, but because of actions by a principal which have misled a third party into believing that a relationship of authority does, in fact, exist. Shadel v. Shell Oil Co., 195 N.J. Super. 311, 314, 478 A.2d 1262 (Law Div. 1984); Restatement, Agency 2d § 267 (1958). The doctrine has been applied in a broad variety of settings and is obviously fact-sensitive. See N. Rothenberg & Son, Inc. v. Nako, 49 N.J. Super. 372, 139 A.2d 783 (App.Div. 1958); Price v. Old Label Liquor Co., Inc., 23 N.J. Super. 165, 92 A.2d 806 (App.Div. 1952); Arthur v. St. Peters Hospital, 169 N.J. Super. 575, 405 A.2d 443 (Law Div. 1979); Elger v. Lindsay, 71 N.J. Super. 82, 176 A.2d 309 (Law Div. 1961).
Contrary to NTS's argument, the record contains evidence supporting the thesis that former President Hageman had apparent authority to offer plaintiff a tenure track position. In an NTS document entitled "Proposed Management Plan," it is noted that "personnel policies in this small [s]eminary traditionally have been defined by custom, oral tradition and ad hoc improvisations." Moreover, in a report to the BTE, President White characterized the formal "permanent appointment" policy as "excessively restrictive," noting that "exceptions have been made on an ad hoc basis in recent years." The question of apparent authority was never fully explored or developed in the Law Division. However, the record presents genuine issues of material fact in that respect.
*130 Plaintiff argues that the Law Division erred by giving blind adherence to NTS's decision denying him tenure. He asserts that the civil courts should apply "neutral principles of law" and determine whether former President Hageman had apparent authority to offer him a "tenure track" position. Under plaintiff's theory, the Law Division would be obliged to embark upon a searching inquiry into the historical practices and customs of both the Church and NTS. As we will note later in our opinion, we do not agree with plaintiff's contention that application of settled principles of agency law requires the exhaustive inquiry he proposes. Accepting his argument at face value, however, we question whether such an extensive inquiry into Church polity would violate the First Amendment.
Resolution of the question depends upon a reconciliation of competing values. The State has a legitimate interest in deciding contract disputes and "a civil court is a proper forum for that resolution." Presbyterian Church v. Hull Church, 393 U.S. 440, 445, 89 S.Ct. 601, 604, 21 L.Ed.2d 658, 663 (1969), on remand sub nom. Presbyterian Church in U.S. v. Eastern Heights Presbyterian Church, 225 Ga. 259, 167 S.E.2d 658 (1969), cert. den., 396 U.S. 1041, 90 S.Ct. 680, 24 L.Ed.2d 685 (1970). Problems arise, however, when these disputes implicate controversies over church doctrine or practice. The First Amendment grants religious organizations "independence from secular control" and the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120, 136 (1952), remittitur amended, 306 N.Y. 38, 114 N.E.2d 197 (1953), reargument denied, 306 N.Y. 572, 115 N.E.2d 681 (1953). It is obvious, however, that not every civil court decision enforcing a contract against a religious organization jeopardizes values protected by the First Amendment. Civil courts do not infringe upon the free exercise of religion merely by opening their doors to disputes involving church contracts. Nevertheless, the collision between religious values and secular *131 authority is particularly acute where, as here, a contract dispute cannot be decided without resolving controversies over church practices and government. At the heart of this case is a controversy concerning the allocation of power within the Church.
While we have found no reported federal or New Jersey opinion dealing with the precise issue raised, several decisions bearing upon related questions provide some guidance. In Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871), the United States Supreme Court held that in resolving property disputes within a hierarchical church, civil courts must defer to the highest church authority that has ruled on the matter. See Maryland & Virginia Eldership v. Church of God at Sharpsburg, 396 U.S. 367, 368-369, 90 S.Ct. 499, 500-501, 24 L.Ed.2d 582, 583-584 (1970) (Brennan, J., concurring); see also Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 720, 96 S.Ct. 2372, 2385-2386, 49 L.Ed.2d 151, 162 (1976), reh'g den., 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976), on remand, 66 Ill.2d 469, 6 Ill.Dec. 792, 363 N.E.2d 606 (1977), appeal after remand, 74 Ill.2d 574, 25 Ill.Dec. 629, 387 N.E.2d 285 (1979), cert. den., 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979). This approach requires inquiry as to where the particular church body has placed ultimate authority over the use of church property. Two types of church government were recognized. In a congregational church, church authority and control over church property rests in the local congregation and its elected elders. In a hierarchical church, the local church is an integral and subordinate part of the general church and subject to its authority. Within that analytical framework, Watson held that in a hierarchical setting where there is a property dispute between a local parish and the general church, civil courts must accept the authoritative ruling of the higher authority within the hierarchy.
In Protestant Episc. Church, Diocese of N.J. v. Graves, 83 N.J. 572, 417 A.2d 19 (1980), cert. den. sub nom. Moore v. Protestant Episcopal Church of N.J., 449 U.S. 1131, 101 S.Ct. *132 954, 67 L.Ed.2d 119 (1981), our Supreme Court held that the "hierarchical (Watson) approach should be utilized in church property disputes in this State." Id. at 580, 417 A.2d 19. While noting that there are other constitutionally acceptable methods of resolving such disputes, id. at 578, 417 A.2d 19, the Court found that the Watson approach best advanced First and Fourteenth Amendment values by permitting "hierarchical religious organizations to establish their own rules and regulations for internal discipline and government and to create tribunals for adjudicating disputes over these matters." Id. at 577, 417 A.2d 19.
Although our Supreme Court adopted the hierarchical approach in deciding church property disputes, it did not foreclose the application of other methods in different contexts. Another acceptable method is the "neutral principles of law" approach enunciated by the United States Supreme Court in Presbyterian Church v. Hull Church, 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665 and Jones v. Wolf, 443 U.S. 595, 599, 99 S.Ct. 3020, 3023, 61 L.Ed.2d 775, 782 (1979), on remand, 244 Ga. 388, 260 S.E.2d 84 (1979), cert. den., 444 U.S. 1080, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980). That method calls for the secular examination of church deeds, constitutions, bylaws, canons and the like for settling church disputes, thereby freeing "civil courts completely from entanglement in questions of religious doctrine, polity, and practice." Jones v. Wolf, 443 U.S. at 603, 99 S.Ct. at 3025, 61 L.Ed.2d at 785.
In many cases, application of the "neutral principles of law" approach constitutes a sensible accommodation of religious and secular values. The method relies on objective, traditional principles of law "familiar to lawyers and judges." Protestant Episc. Church, Diocese of N.J. v. Graves, 83 N.J. at 584, 417 A.2d 19 (Schreiber, J., dissenting). The analysis used is that normally followed in private law. Ibid. The approach "is completely secular in its operation." Ibid. It is a method with which courts are familiar, and contains the "peculiar genius of private-law systems in general  flexibility in ordering private *133 rights and obligations to reflect the intentions of the parties." Jones v. Wolf, 443 U.S. at 603, 99 S.Ct. at 3025, 61 L.Ed.2d at 785. Unlike the hierarchical approach, this method does not displace free religious choices "by placing its weight" behind one Church agency or body over another. Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. at 733, 96 S.Ct. at 2391, 49 L.Ed.2d at 176.
We question, however, whether application of the "neutral principles of law" approach, at least as urged by plaintiff, would serve the interests of justice in this case. A cogent argument can be made that, instead, its application would defeat the ends it was designed to serve. Under plaintiff's theory, to ascertain whether former President Hageman had the apparent authority to offer plaintiff a tenure track position would require a searching examination of the polity and administration of the Church. If, as presently appears, the locus of appointive authority is ambiguous, a careful scrutiny of past practices and customs would be necessary. To permit civil courts to probe deeply into the allocation of power within a religious organization would result in a pervasive secular intrusion into Church government and administration. In other words, application of the "neutral principles of law" approach is consonant with the prohibitions of the First Amendment only if the particular legal question presented, here apparent authority, can be determined without the resolution of doctrinal questions and without extensive inquiry into church polity.
We are satisfied that an inquiry into the history and customs of the Church in appointing faculty and granting tenure, as requested by plaintiff, would constitute an "`establishment of religion' with a vengeance." Maryland & Virginia Eldership v. Church of God at Sharpsburg, 254 Md. 162, 254 A.2d 162, 170 (Md. 1969), dismissed for want of a substantial federal question, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970). See also Chavis v. Rowe, 93 N.J. 103, 110-111, 459 A.2d 674 (1983). In short, insinuation by civil courts into the customs *134 and usages of the bylaws and the constitution, into the administration and polity of the Church in the hope of uncovering clues with respect to where the power to grant tenure resides, would threaten the freedom of the Church from secular entanglement. Compare Elmora Hebrew Center v. Fishman, 215 N.J. Super. 589, 522 A.2d 497 (App.Div. 1987), appeal after remand, 239 N.J. Super. 229, 570 A.2d 1297 (App.Div. 1990), with Sister Marilyn Therese Welter and Sister Carolyn Therese Welter v. Seton Hall University, 243 N.J. Super. 263, 579 A.2d 332 (App.Div. 1990); Hardwick v. First Baptist Church, 217 N.J. Super. 85, 524 A.2d 1298 (App.Div. 1987); Jewish Center of Sussex County v. Whale, 165 N.J. Super. 84, 397 A.2d 712 (Ch.Div. 1978), aff'd, 172 N.J. Super. 165, 411 A.2d 475 (App.Div. 1980), aff'd 86 N.J. 619, 432 A.2d 521 (1981).
Plaintiff's reliance on Reardon v. LeMoyne, 122 N.H. 1042, 454 A.2d 428 (1982), is misplaced. There, the New Hampshire Supreme Court held that teachers who alleged they were wrongfully discharged from a parochial school could seek judicial redress without violating the First Amendment. Id. 454 A.2d at 431-432. However, that case did not present any of the compounding problems which complicate the issue raised here. Specifically, the question of apparent authority and the corresponding issue of the allocation of church powers were not presented. The contract claim in Reardon was clear cut. Its resolution did not require inquiry into church administration and polity.
We stress that by declining to exercise jurisdiction over this dispute we do not leave plaintiff without a remedy. As we mentioned in our recital of the facts, NTS's personnel manual provides an optional grievance process. Although the record is not entirely clear, it appears that plaintiff attempted to exercise his rights under the established, written grievance procedure. This attempt was apparently aborted by reason of President White's effort to submit the issue to the BTE's Executive Committee. The personnel manual clearly states that the *135 BTE's Student and Faculty Concerns Committee is to resolve faculty grievances. Nothing in NTS's extensive brief suggests otherwise.
While we are aware of decisions in other jurisdictions barring civil courts from compelling a church or religious organization to follow its own rules of procedure, see, e.g., Natal v. Christian and Missionary Alliance, 878 F.2d 1575, 1577 (1st Cir.1989); Higgins v. Maher, 210 Cal. App.3d 1168, 1173-1174, 258 Cal. Rptr. 757, 759-760 (Ct.App. 1989), cert. den., ___ U.S. ___, 110 S.Ct. 1135, 107 L.Ed.2d 1040 (1990); O'Connor Hosp. v. Superior Court, 195 Cal. App.3d 546, 240 Cal. Rptr. 766, 771 (6 Dist. 1987); Zimbler v. Felber, 111 Misc.2d 867, 870-72, 445 N.Y.S.2d 366, 369 (Sup.Ct. 1981), our Supreme Court has adopted a different course. In Baugh v. Thomas, 56 N.J. 203, 265 A.2d 675 (1970), the Court refused to "accept the proposition that civil courts lack jurisdiction to determine whether established procedures of a religious organization, as proved, have been followed...." Id. at 208, 265 A.2d 675. That principle applies with equal force here.
To recapitulate, we conclude that the hierarchical (Watson) approach should be applied in this case and, therefore, the Law Division was correct in declining to exercise jurisdiction over the dispute. Nevertheless, the Church and NTS are obliged by their established procedures to provide plaintiff with a forum for resolution of his claim. Plaintiff's grievance should be presented to the BTE's Student and Faculty Affairs Committee for its consideration.
The result we reach would not be different even were we to apply the "neutral principles of law" approach. NTS's personnel manual states unequivocally that grievances are to be submitted to the BTE's Student and Faculty Affairs Committee. This provision constituted a vital part of plaintiff's employment contract. See Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 491 A.2d 1257 (1985), judgment modified, 101 N.J. 10, 499 A.2d 515 (1985). Of course, we recognize that the grievance *136 process was optional. We are also aware that the exhaustion of remedies doctrine does not apply to a self-governing religious institution and that a party may seek judicial relief based on a church's failure to follow its own procedures. See Baugh v. Thomas, 56 N.J. at 209, 265 A.2d 675. Nevertheless, on the record before us, we find that plaintiff attempted to exercise his rights under the grievance process. Where, as here, the parties themselves have agreed that a grievance procedure is to provide a conclusive resolution of their differences, we perceive nothing unfair in approving or supporting their choice. See Stigliano v. St. Rose High School, 198 N.J. Super. 520, 530, 487 A.2d 1260 (App.Div. 1984).
We, therefore, affirm the summary judgment dismissing plaintiff's suit. However, we fully expect that the NTS will fairly comply with its established procedures and that plaintiff's substantive claim as well as his assertion that he was constructively terminated,[1]see Rubenstein v. Rubenstein, 20 N.J. 359, 366, 120 A.2d 11 (1956); Wolf v. Marlton Corp., 57 N.J. Super. 278, 287, 154 A.2d 625 (App.Div. 1959), will be presented to the BTE's Student and Faculty Affairs Committee.
Affirmed.
NOTES
[1] At oral argument counsel for NTS conceded a genuine issue of material fact exists with respect to whether plaintiff's resignation was made under duress. See Inside Radio/Radio Only, Inc. v. Board of Review, 204 N.J. Super. 296, 498 A.2d 791 (App.Div. 1985); Domenico v. Labor & Industry Dep't Review Bd., 192 N.J. Super. 284, 469 A.2d 961 (App.Div. 1983); Means v. Hamilton Hosp. Bd. of Review, 172 N.J. Super. 465, 412 A.2d 1053 (App.Div. 1980) certif. den., 84 N.J. 451, 420 A.2d 348 (1980); Condo v. Board of Review, 158 N.J. Super. 172, 385 A.2d 920 (App.Div. 1978); Associated Utility Services v. Board of Review, 131 N.J. Super. 584, 331 A.2d 39 (App.Div. 1974). We agree with that concession. The question of constructive discharge should be decided by way of the grievance process.